UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KARI L. LARSON, )
)
Plaintiff, )
)
vs. ) No. 3:24-cv-05716-BHS
)
QUILLAYUTE VALLEY SCHOOL )
DISTRICT, BRIAN WEEKES, AND )
KYLE WEAKLEY, )
)
Defendants. )

DEPOSITION OF DIANA REAUME
Taken in behalf of the Plaintiff
June 25, 2025
***TAKEN VIA ZOOM VIDEOCONFERENCE***

Reported by Jacqueline Lee Butler
RPR, CSR, CCR





BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of DIANA REAUME was taken in behalf of the Plaintiff, before Jacqueline Lee Butler, Registered Professional Reporter, Oregon Certified Shorthand Reporter, and Washington Certified Court Reporter, on Wednesday, the 25th day of June, 2025, commencing at the hour of 10:00 a.m., the proceedings being reported and all parties appearing via Zoom conference.

APPEARANCES

For Plaintiff:

Daniel Charles Gallagher
Gallagher Law Office P.S.
10611 Battle Point Drive NE
Bainbridge Island, WA 98110-1493
(206) 855-9310
dan@nwprolaw.com

Rachel Lynn Anyan
Anyan Legal Services LLC
21833 36th Avenue NW
Stanwood, WA 98292
(714) 227-3205
rachel@anyanlegalservices.com





APPEARANCES (Continued)

For Defendant Quillayute Valley/Weakley:

Anna M. Shumar
Duncan K. Fobes
Patterson Buchanan Fobes & Leitch, Inc., P.S.
1000 Second Avenue, 30th Floor
Seattle, WA 98104
(206) 462-6700
ams@pattersonbuchanan.com
dkf@pattersonbuchanan.com

For Defendant Weekes:
Lucy R. Clifthorne
Grace Cowan
Vandeberg Johnson Gandara PS
1201 Pacific Avenue, Suite 1900
Tacoma, WA 98402-4315
(253) 383-3791
lclifthorne@vjglaw.com
gcowan@vjglaw.com

Also Present: Brian Weekes

* * * * *





EXAMINATION INDEX

Examination by Ms. Anyan Page 6

EXHIBIT INDEX


| Number | Description | Page |
|---|---|---|
| 1 | NOD 30(B)(6) with Topics | 24 |
| 2 | Video Surveillance on School Grounds or Property | 26 |
| 3 | Video Surveillance Cameras | 29 |
| 4 | Misconduct Investigation Retention Policy | 44 |
| 5 | Coaches Handbook | 50 |
| 6 | WIAA Fourteen Legal Duties of a Coach | 54 |
| 7 | 3205_Sexual_Harassment_of_ Students_Prohibited | 73 |
| 8 | Sexual Harassment Procedure | 75 |
| 9 | 5011_Personnel_-_Sexual_ Harassment_of_District_Staff | 85 |
| 10 | 5253_Maintaining_Professional_ Staff_Student_Boundaries | 90 |
| 11 | 5253P Maintaining Professional Staff-student boundaries | 92 |
| 12 | 3421_Child Abuse, Neglect, and Exploitation Prevention | 94 |
| 13 | 5281_Disciplinary Action and | 97 |

District, it has to be reported to law enforcement?
A I do.
(Exhibit No. 13 marked.)
BY MS. ANYAN: (Continuing)
Q And on Exhibit 13 -- this is Policy No. 5281, "Disciplinary Action and Discharge." Do you recognize this document?
A I do.
Q And are you familiar with it?
A I am.
Q And so, under this policy, would you agree that sexual behavior such as sexual misconduct, nonprofessional conduct, and intentional discrimination are examples of behavior that would warrant disciplinary action or discharge?
A Yes.
Q And in the event that allegations are made against a staff member for misconduct with minors, it states that "The superintendent may contact CPS for evidence regarding the staff member." Are you familiar with that procedure?
A Yes.
Q Have you ever used that before?
A Yes.
Q Did you use that when the reports from







Ms. Gale were made about Mr. Weekes?
A Under the report that we received was specific information about him touching students underneath their shorts -- and I believe that was in August of 2023 -- we did. We reported to the police.
Q Did you ever contact Child Protective Services central registry for evidence regarding Mr. Weekes?
A No. Generally, my understanding, what happens when we report to -- for a potential crime, then the police report to CPS.
Q Okay. I'm referring to this section here, and I was just curious if that -- it says "may contact"; so you're not required. I'm just trying to find out if you used that at all to investigate Mr. Weekes.
A No.
Q Okay. And then also, as part of this policy, it states that "The District shall not enter any into contract to suppress information about verbal or physical abuse or sexual misconduct by a present or former employee. Neither shall the District expunge such information from the employee's file."
So do you understand that to mean that the -- if allegations of physical abuse or sexual misconduct are made against an employee, the District is required to not suppress that information or remove that







information from an employee's file?
A My understanding is, if there -- if the District can determine a finding, that that goes into the personnel file. If there is an investigation that there is not a finding, that does not go into their personal file.
Q Okay. So you understand information generally to just mean if it led to a formal investigation, not necessarily if no investigation was done?
A Ask the question again, please.
Q Yeah. I'm talking about this highlighted --
A Okay. Let me read it again, and I'll see if I can put it in context with your question.
Q Sure.
A I understand that. Yeah.
Q So is it your understanding that if an allegation of physical abuse or sexual misconduct by a present or former employee is made, than that information needs to be kept in the employee's file?
A Yes.
Q Okay. I'm going to move on to Exhibit 14.
(Exhibit No. 14 marked.)
BY MS. ANYAN: (Continuing)
Q Can you see this document?
A I can see it.







Q Are you familiar with this document?
A I am familiar with it.
Q This is the statement of Pam Gale; and, in the first sentence -- she states she wrote this statement on August 14th, 2024. Do you agree that that's about when you received this statement?
A I do.
Q When was the first time you heard about the incidents she's referencing in this statement?
A On this date.
Q On August 14th, 2024?
A Correct.
Q There's a few incidents that are reported in this statement. One of them is the middle school boy yelling about Mr. Weekes massaging the boys like he was with the girls. Another one is about an observation Ms. Gale made when she saw Mr. Weekes in the weight room with one of the high school girl athletes. The lights were out, it was dark, and he was supposedly stretching her sore muscles. She reported that that happened on April 16th, 2019. Is that your understanding?
A That is my understanding.
Q And is this the first time that you heard about that incident on April 16th, 2019?
A I was aware that she had reported incidents to

District?
A No, they are not.
Q Okay. Is Mr. Kaiser typically the third-party investigator that the District hires to do these kinds of investigations?
A We actually don't hire -- the third-party investigation is part of the privilege of being a WSRMP member, our insurance pool; and so when we report over a claim and we feel like we need a third-party investigator, then we request one through the pool, and we are assigned one.
Q Sorry. I missed that last part of your statement.
A We're generally assigned one. I don't know if it -- if the attorney we're working with -- I don't know how that works. I just know it is a service that we can use through the pool.
Q Okay. And is it possible for the District to ask Mr. Kaiser for his interview notes?
A Yes, I believe so.
Q So we will request those since they are responsive to our discovery requests. So if you could please work with your attorneys in getting those notes produced to us, that would be great.
A Okay.





(INFORMATION TO PRODUCE)
MS. ANYAN: We'll go to Exhibit 17.
(Exhibit No. 17 marked.)
BY MS. ANYAN: (Continuing)
Q Do you recognize this document?
A I do.
Q So this is from April 26, 2019. What do you understand this document to be?
A My understanding is that is a directive, to Mr. Weekes from Mr. Weakley, after he previewed videos of when -- of a complaint of him rubbing a student's legs and that he provided him to not have any physical contact with any female track athletes while acting in his role as a track coach.
Q And were you aware at the time that this document was provided to Mr. Weekes?
A Correct.
Q This is Exhibit 18.
(Exhibit No. 18 marked.)
BY MS. ANYAN: (Continuing)
Q Do you recognize this email exchange?
A Yes.
Q When was the first time you saw this email thread?
A I don't recall. But I would say when we -- we





began providing documents to our attorneys.
Q Okay. So not until recently?
A Correct.
Q So on April 28th, 2019, Mr. Weakley, it looks like, he forwarded this to you.
A Yeah. I didn't recall seeing it.
Q Okay. Did you have any conversations with Mr. Weakley at this time about this incident?
A We must have, but I really don't remember what specific things we would have talked about.
Q Would it help to review the entire document to see if it refreshes your recollection.
A Sure.
Q All right. So let's start at the top of the page, and just let me know when I should scroll down.
A Okay.
Q It looks like these -- some of these are duplicates from previous responses.
A Right.
Q I want you to be able to see the full document just in case it helps.
A Got it.
So what was the question again? I'm sorry.
Q I'm going to keep scrolling and let you read the whole thing.





A Yeah. I think I got it.
Q Okay. So does this refresh your recollection at all about the conversation you had with Mr. Weakley about this incident in 2019?
A The most that I remember is that he was going to preview video of the alleged events, of the time frame, so that we could determine next steps. And once he had previewed the video, he could clearly see Mr. Weekes rubbing athletes' legs, that it was not -- wouldn't be considered -- well, anyway, I believe that what he did, then, is did the directive immediately following the previewing of the video.
And, really, I believe we made the determination not to investigate because we had the videos. But I don't recall specifically any of our discussions because that's a long time ago when there have been a lot of things in between. So I don't recall specifics.
Q Were you concerned about Mr. Weekes rubbing female students' legs at the time?
A Yes. And it's my understanding that, once the directive was issued, it quit -- is my understanding.
Q Do you understand that -- sorry. Were you going to say something?
A No.

Q Do you understand that this all came about because Pam Gale and Robin Poole reported this incident to Mr. Weakley shortly after April 16th, 2019?
A I had known that Pam Gale had reported it. I did not know until recently that Robin Poole was with Pam Gale.
Q Are you aware of any documentation from -- that Mr. Weakley created regarding that allegation back in 2019?
A No, I am not.
Q Would that comply with the policies we just reviewed?
A Again, I don't know -- I don't know what Pam reported specifically. I do know that it prompted us to look at video. So that would be a question for Mr. Weakley. We would have followed our policy based on how -- or what was brought forward.
Q If Ms. Gale and Mr. Poole both state that that is the exact same statement they provided Mr. Weakley back in 2019 shortly after April 16th, do you have anything to contradict their statement?
MR. FOBES: Objection to the form.
But go ahead and answer.
THE WITNESS: No, I don't.





BY MS. ANYAN: (Continuing)
Q But when you received her written statement in 2024 -- how many times has she been interviewed by the third-party investigator before she wrote that statement?
A My understanding was once.
Q And you were present during that interview; correct?
A No, I was not.
Q Was another administrator present during that interview?
A Mr. Weakley was.
Q Why didn't Mr. Weakley report to law enforcement at that time the same mandatory report that you made to the police in September 2024?
A I honestly don't recall, or I don't know.
Q Are you aware of any other documentation Mr. Weakley created about this incident in 2019 other than these two documents we've reviewed?
A No.
Q And the discovery requests that we sent in this case -- the verification page was signed by you; correct?
A Correct.
Q What did you -- what process did you follow in





ensuring that you had all documents from Mr. Weakley that were responsive to our requests? And I'm not asking for any communications you had with your lawyers.
A I guess I'm not understanding the question.
Q So were you responsible for gathering all of the documents on behalf of the District for -- that were responsive to our discovery requests?
A I think there were some that Kyle was responsible for getting, but it had to do with his -- we reviewed everything, but I think he got his documents from -- well, any of the electronic communication we would get from our technician, and then any documents he would have in any files, any that I would have, we -- again, I was under the impression he was responsible --
Can I ask Duncan -- I mean, I believe I did my part.
MR. FOBES: Well, yeah, Diana, just describe what you -- just describe what you did to get Kyle's documents.
THE WITNESS: Okay. I would ask him to get -- retrieve any of the documents regarding any of the requests for production, any of the documents, gather them together, and that's how I ensured it. I mean, other than the -- like, my documents would be on my computer or in files. His documents would be in his





computer or in his files.
And then, again, for email and any text messages, he had to search his phone. We had our technician help him search his phone. Same with me. And then also, in the system, the technician does a search through Google. If we delete files, then they're saved somewhere else, and he can retrieve all of them. And I believe that's how we retrieved all of the email exchange between Mr. Weekes and Ms. Larson.
BY MS. ANYAN: (Continuing)
Q All of those emails had been deleted?
A I don't know that.
Q Okay.
A I don't know that, but they reside in our Google bank. They're there. They were there permanently.
Q Okay. You made a statement that that's how you retrieved the emails between Mr. Weekes and Ms. Larson -- by looking in the deleted folders, but maybe I misunderstood that.
A Yeah, you misunderstood. It might be that we deleted any communication, and I think you requested all communication. It may have not seemed pertinent or it may have been something -- for whatever reason, we accidently deleted it in our working Google file folder,

but they're saved in the district so the technician can retrieve any documents.

Q Okay. And then as for -- as far as documenting allegations of sexual misconduct, do you think that the statement that Ms. Gale provided, about him being alone in a room with the lights out and having his hand on a female student's legs, rises to the level of misconduct -- sexual misconduct?

A Yes.

Q And so, per the policy, any allegation reported to the Title IX coordinator regarding sexual misconduct would be documented in writing; correct?

A Correct.

Q But we don't have that document available; right?

A Correct.

Q And did you ask Mr. Weakley to look through his informal complaint files as Title IX coordinator to find those documents?

A I did.

Q And what was his response?

A If you're referring to -- back in 2019, he did not find anything.

Q Okay.

A Can I --





Q Do you know if -- if -- so the student that was seen in the mat room -- I believe it was the mat room -- S[redacted] M[redacted] -- do you know if she was contacted as part of the investigation in 2019?

A No, I believe she was not.

Q Why not?

A I believe that -- again, I don't know what was exactly reported to Mr. Weakley from Ms. Gale and, I guess, Mr. Poole. But we -- or Kyle watched the video, and we had the entire video from that particular day, and we did not see that happen.

Q So the only video that was produced to us started at 5:06 p.m. on April 16th, 2019. Do you know that?

A Yes. There's also one of the mat room. There are two videos.

Q So I know there's some confusion with the videos that we're trying to suss out with your attorneys, but we have one video that is incorrectly titled a copy of April 15th, and one video that is a copy from April 18th. We've been told that the one titled April 15 is actually from April 16th.

A That is correct.

Q But the other one is still April 18th?

A Correct.





Q So if you reviewed the entire video for the entire day on April 16th, why did we only receive a small snippet that starts at 5:06 p.m.?

A That would be a question for our director of maintenance who was requested to review video. And, typically, if there's a situation where we need to review video, then he will spend the time going through the videos. As I said, there are multiple angles, and it takes quite a bit of time to go through two hours of video to make sure you're thorough in capturing what would have occurred during that time.

Q Are you aware that, when Mr. Weakley showed the video to Ms. Gale, she told him, "This is not the time that I gave you. You need to go back about 20 minutes -- 10 to 20 minutes"?

A In my decision with Mr. Weakley, he said he didn't show the video.

Q He did not show Ms. Gale the video at all?

A No. We would not do that for contractual rights. If we are going to impose discipline on any employee, that would be within the same bargaining unit. We would not show them -- we actually do not show staff video. We don't show parents video. We don't show students video.

Q Is that in compliance with your video





surveillance policy that, if a complainant -- if a complaint is made that a student or staff member could review the video having to do with their complaint?

A I would believe so, and that has been our practice.

Q And is that a discussion that you had with Mr. Weakley? Did you ask him if he ever showed Ms. Gale the videos?

A I did.

Q Do you know why Mr. Weakley would have told Ms. Gale that he would look for the correct timestamp and bring her back to show her that correct video?

A I don't know that he said that. This is the first that I've heard of that.

Q So we just discussed quite a few policies and procedures. Do you agree that adherence to the policies and procedures of the District is meant to protect students and staff?

A I do.

Q Do you agree that, if policies and procedures are not followed when serious allegations or misconduct are reported, that the perpetrator could be emboldened to continue his conduct?

A I do.

Q Do you agree that the purpose -- one of the

all the trainings are in the portal. They -- and they have to do it every year. And then they also have to do any assigned training that the District would provide, and that is generally every year neglect, mandatory reporting, student neglect, mandatory reporting, a prohibition of sexual harassment, boundary invasion, the ones that, I believe, would directly affect the safety of a student.

Q And those typically align with the documents we see listed in the appendix for the handbook for the coaches; correct?

A Correct. And then, again -- I think I mentioned this earlier -- but I do know that Mr. Weakley has a preseason coach's meeting that the coaches have to attend where he provides -- goes over the handbook, goes over any regulation changes for WIAA, and then would go over any policy as well. So there's a three-prong approach to it.

Q Okay.

A To the training.

Q Okay. And the last sentence of this bottom paragraph, looks like it's supposed to go on to the next page, but it doesn't.

A Okay.

Q I think we might be missing a page from that.





A Yes. I can get that for sure. Yeah.

Q Okay.

A I'm wondering if it was on the back side, and we only copied one side.

Q Okay. Yeah. If we can just ensure that all of the pages for the documents we requested have been produced, that would be great.

A Okay.

(INFORMATION TO PRODUCE)

BY MS. ANYAN: (Continuing)

Q Going back to the 2019 incident, you recalled hearing about it at the time and that Mr. Weakley had reviewed the surveillance and determined it was not enough to do an investigation. But why was it enough in 2024 to report it to the police department?

A We had specific student names of specific incidents of specific places. Again, I don't know what was exactly reported to Mr. Weakley from Pam Gale and Robin Poole, but we had very specific -- very specific information regarding alleged actions.

Q And we don't know -- or we don't have that information from 2019 because Mr. Weakley didn't record it in writing; correct?

A Correct.

Q What are Mr. Weakley's responsibilities in his





role as assistant superintendent?

A He is responsible for athletics, special education, federal grants. I don't know how many he has. I have some of the grants, and he oversees some of the other grants. And then Title IX. Those are his primary responsibilities.

Q And so, as far as his responsibility for athletics -- he is the athletic director; correct?

A Correct.

Q What are his responsibilities as athletic director?

A To supervise all of the programs, evaluate the head coaches, provide -- make sure that the appropriate training and qualifications are met. If there's any reporting that needs to happen to WIAA for student ejections; attend district athletic meetings; manage any competitions that are local; make sure that all of our equipment, including uniforms, are managed properly, accounted for, as district property; development of any programs or training for coaches. I mean, just basically everything. Making sure that we have referees. Making sure there are travel arrangements. All of that. Anything that has to do with athletics.

Q Okay. And you also stated that he was the -- responsible for Title IX. Did you designate him to





serve in that role?

A Yes.

Q And so you oversee him in that role?

A Yes. And, actually, he's the compliance officer. Depending on what years Title IX policy is in place, I am the decision-maker, if you walk through the procedure. He's the compliance investigator, and then I'm the decision-maker. I think they have to be two different people.

Q Would the decision-maker make a determination on whether or not a complaint that falls under Title IX is investigated?

A No.

Q Who makes that decision?

A That is generally Kyle, but it would be in conference with me and probably our attorney through WSRMP.

Q And so what role -- or what responsibilities do you have as a decision-maker under Title IX?

A When you get through the Title IX process and you do the investigation, you notify the parties, and you do the hearing with both the parties. I would need to determine whether or not there is a finding, and then I believe, as the decision-maker, that would not be Kyle Weakley's role. And then, if there is any appeal

A No.
Q Are you aware of an investigation into those allegations --
A No.
Q -- of Mr. Weakley?
A No.
Q Are you aware that Mr. Weakley never spoke to the female students about those allegations?
A I know he spoke to the parents, and it was my understanding that they did not want him to speak to the daughter.
Q You believe that that's what Mr. G[redacted] wanted?
A I don't know what Mr. G[redacted] wanted.
Q Mr. G[redacted] was the parent we're talking about; right?
A Correct.
Q And you mentioned that he may have -- that Mr. Weekes may have received a directive regarding this incident. Is it documented anywhere?
A I don't know.
Q Could you look for that; and, if you could find anything about those allegations -- to produce those to us, please?
A Yes.







(INFORMATION TO PRODUCE)
BY MS. ANYAN: (Continuing)
Q What was Mr. Weakley's responsibility to report these incidents to either you or to the school board?
A He wouldn't report directly to the school board. I'm the one who would report directly to the school board. And it would be an executive session about any public employee's performance.
Q So when do allegations rise to the level that Mr. Weakley needs to get you involved in them?
A Again, if there are allegations that we would need to report to WSRMP, our insurance pool -- and those generally are the higher level ones, complaints that can be substantiated, usually of sexual harassment, boundary invasion, any alcohol abuse, drug abuse on school premises, that type of falsification of records, any of those.
Q Earlier you testified that you agreed that a staff member touching a student's butt was sexual misconduct. And when we were reviewing the policies, it stated that any allegations, whether or not they're investigated, need to be reported to law enforcement. Do you remember that?
A I do remember that, yes.







Q So why wouldn't something like this be reported to law enforcement if he had his hand high up on someone's thigh or under their shorts?
A It would be if that's what was reported to Mr. Weakley.
Q It should have been, you mean; right?
A Yes. If somebody made a complaint about that.
Q Did the District's policy regarding male staff, physical contact with female students, differ between the middle school and the high school?
A No.
Q It's the same policy regardless; correct?
A Correct.
Q Have you ever observed any other physical contact between male coaches and female athletes, the type we're talking about here? Because I don't want to -- it's kind of a broad question.
A Yes. I was going to say a pat on the back; a hug, you know, when they get off the court. No, I don't believe I have.
Q Besides Ms. Larson's allegation in this matter, have you received reports or complaints regarding male staff physical contact with female students?
A You mean in my -- overall have I received any?







Q Yes.
A I would have to go back and review each year. I don't recall any, right off the top of my head.
Q So when we received your discovery responses, you list -- you listed several years in which there were complaints made of discrimination. Were those only complaints that were investigated?
A Those were all that I had on record. I don't know. I need to go back and look to see what I provided to answer that fairly.
Q Okay. What physical contact between male staff and female students is appropriate?
A I would say, in this day and age, none.
Q And is that what the coaches and teachers are trained on?
A I would believe so.
Q You mentioned that you have seen coaches give students hugs on the court. Would that still be acceptable based on your definition?
A I was giving that as an example. I don't know that I have seen that. That might be something I would see. I would just recommend to coaches not -- and staff not to touch kids.
Q What about coaches who are stretching kids? Is that acceptable?