UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KARI L. LARSON, )
)
Plaintiff, )
)
vs. ) No. 3:24-cv-05716-BHS
)
QUILLAYUTE VALLEY SCHOOL )
DISTRICT No. 402, BRIAN WEEKES, )
And his marital community, )
KYLE WEAKLEY, and his marital )
community, )
)
Defendants. )
)

DEPOSITION UPON ORAL EXAMINATION OF KYLE WEAKLEY
June 27, 2025
ALL PARTIES APPEARED VIA REMOTE VIDEO-CONFERENCE





APPEARANCES:
FOR THE PLAINTIFF:
DANIEL C. GALLAGHER
GALLAGHER LAW OFFICE, P.S.
10611 BATTLE POINT DRIVE NE
BAINBRIDGE ISLAND, WASHINGTON 98110
(206) 855-9310
dan@nwprolaw.com

FOR THE DEFENDANTS KYLE WEAKLEY AND QUILLAYUTE VALLEY SCHOOL DISTRICT:

DUNCAN K. FOBES
ANNA SHUMAR
PATTERSON BUCHANAN FOBES & LEITCH, INC., P.S.
1050 SW SIXTH AVENUE, SUITE 1100
PORTLAND, OREGON 97204
(503) 200-5400
dkf@pattersonbuchanan.com
ams@pattersonbuchanan.com

FOR THE DEFENDANT BRIAN WEEKES:
LUCY CLIFTHORNE
GRACE COWEN
VANDEBERG JOHNSON GANDARA, P.S.
1201 PACIFIC AVENUE, SUITE 1900
TACOMA, WASHINGTON 98402
(253) 383-3791
lclifthorne@vjglaw.com
gcowan@vjglaw.com

ALSO PRESENT:
BRIAN WEEKES





I N D E X


| EXAMINATION | PAGE |
|---|---|
| MR. GALLAGHER | 5 |


E X H I B I T I N D E X


| EXHIBIT NO. | | PAGE |
|---|---|---|
| 1. | Policy 6590-P: Management Support Sexual Harassment | 55 |
| 2. | Policy 5253-P: Personnel: Maintaining Professional and Staff Boundaries | 56 |
| 3. | 11/21/23 Letter to D. Reaume and B. Weakley from K. Larson | 97 |
| 4. | 12/13/23 Letter from QVSD to K. Larson Re: Notice of Allegations | 150 |
| 5. | Policy 5011-P: Personnel: Sexual Harassment of District Staff Prohibited Policy, Bates QVSD 3266-3274 | 52 |
| 6. | Policy 5011-P: Personnel: Sexual Harassment of District Staff Prohibited Policy, Bates QVSD 3263-3265 | 154 |
| 7. | 9/5/24 Handwritten Notes re Meeting with P. Gale (Follow-up after R. Kaiser's Interview) | 162 |
| 8. | 4/20/22 Text Screenshot re: Meeting P. Gale to B. Weekes | 165 |
| 9. | To Whom This May Concern Letter | 167 |


(Continued)





E X H I B I T I N D E X


| EXHIBIT NO. | | PAGE |
|---|---|---|
| 10. | 9/9/24 Email String re: Confidential | 182 |
| 11. | 4/26/19 Letter re: Letter of Direction from K. Weakley to B. Weekes | 186 |
| 12. | Procedure 6608: Management Support Video Surveillance Cameras | 190 |
| 13. | 8/16/23 Text Message Exchange Screenshot | 196 |
| 14. | 10/4/23 Email String re CC to B. Weakley from K. Larson | 200 |
| 15. | Job Description: Assistant Superintendent of Teaching and Learning | 203 |
| 16. | 4/26/19 Message String re Afternoon Conversation | 204 |
| 17. | Forks Junior-Senior High School Coaches Handbook | 208 |
| 18. | WIAA Mission Statement, Purpose and Goals and Coaching Code of Ethics | 209 |
| 19. | Policy Number 5253: Personnel Policy Maintaining Professional Staff and Student Boundaries | 210 |

Q Would that behavior be appropriate?
A No.
Q Have you ever received any complaints about any coaches of middle school girls, inappropriate physical contact with the students, athletes?
A I did.
Q Okay. Why don't you describe that?
A So are you talking about specifically middle school students?
Q At this point, yeah.
A So in April of 2019, I believe that Ms. Gale, the high school track coach, and Mr. Poole reported to me, again, that Mr. Weekes was stretching middle school athletes and they felt like it was un- -- made them uncomfortable or, again, a boundary invasion.
Q And did they come to you with that information; is that what happened?
A I believe they came to the district office and yes.
Q Where did you meet with them?
A I'm not positive if it was up front or just somewhere in the district office; I'm not sure.
Q Were there any other witnesses to the conversation?
A I don't believe so.
Q And what do you recall specifically being told by Ms. Gale?





A That again, Mister -- because this would be in a series of multiple reports; again, that Mr. Weekes was stretching junior high athletes, and it was making her uncomfortable or it didn't seem appropriate.
Q When you say "multiple reports," are you referring to multiple reports to you by Ms. Gale?
A Previous -- previously in April, yeah.
Q Previous to this meeting in April?
A So they -- she made multiple reports this April. The one that you are referring to about the junior high students, I think, was, like, the last one.
Q Okay. What do you recall from the previous reports: How did you receive them, and what documentation, if any, did you make of that?
A So what I remember is that in mid-April she had come to the district office. Actually, I don't know if it was the district office.
But she had reported to me, somewhere verbally, that Mr. Weekes was, again, stretching high school or -- high school athletes in the hallway between the weight room and the mat room; and, again, it was making people uncomfortable.
Q Do you recall any other specifics about what she told





you?
A So she had said that -- well, I think I had asked her, you know, date, time, location of where these events were happening. And she provided those. One was the weight room; one was the mat room.
Q So, just for clarity, was this the first time you recall speaking to her about Mr. Weekes massaging the middle school -- or rather, the high school students; or is this just your recollection of the multiple -- you said you got multiple reports from her previously.
And I'm wondering if this was one of the reports or, you know, was this the whole thing?
A I missed the first part of your question. Your mic wasn't on.
Q Okay, yeah.
You said that Ms. Gale provided a series of multiple reports to you.
And I'm asking: This one you just described, is that the first report that you received from Ms. Gale?
A Yeah. So, again, going back and looking at the video that was captured, it would have been around April 16th, April 18th, and then I believe the last one was the report from the junior high at the track.





Q Okay. Are you saying you looked at video to refresh your recollection about the reports?
A I did look at video, yeah.
Q Okay. Did Ms. Gale request that you pull video of the massage incidents?
A I don't know if she requested that or not.
Q Do you recall whether or not you pulled video in response to her complaints?
A Yeah, I pulled video from the two videos that you guys have, the 16th and I think the 18th.
Q Okay. And I don't want to mischaracterize the testimony previously given by the superintendents.
But I believe she indicated that she watched and you watched the entire day's video of April 16th.
Is that what you recall?
A Yes.
MR. FOBES: Objection, form.
But go ahead.
Q (By Mr. Gallagher) And the video that we received -- I don't remember the exact time; I'd have to pull it up -- but I believe it begins after the timeline that Ms. Gale referred you to.
Do you have a recollection of Ms. Gale being frustrated with the time of the video that was pulled, the time stamp?

A I don't have a recollection. But I have her report that she provided when she was interviewed.
Q All right. My understanding -- and tell me if this is what you understand -- is that -- my recollection is that you told Ms. Gale that you would pull the video and you would have her come back in and watch it with you, and that she did come back in and look at the video with you.
Is that your recollection?
A Not at all, no.
Q Okay.
A In fact, I don't ever watching the video with Ms. Gale.
And that wouldn't be our practice, to bring people in to view video as part of an investigation.
Q All right. So you are saying that, at that time, you had begun an investigation?
A Yes.
Q And what all did you do, in the course of the investigation, to satisfy the policy requirements regarding an investigation?
And what was the investigation -- what was the purpose; was the -- strike all that.
Was the investigation's purpose regarding evaluating possible boundary invasions by Mr. Weekes?





A Yes.
Q Did the investigation include a review of whether or not the students were sexually harassed or abused?
A That would have been part of investigation, based on, you know, reviewing the video and what was reported, if that would have been the case.
Q And aside from pulling video and looking at the video, what else did you do to investigate the allegations?
A That initial one. And after I had watched it and reviewed it, I believe that we had captured everything that had been reported and felt that the video, kind of, spoke for itself in terms of what had happened.
Q All right. And what else did you do in the investigation?
A That was it.
Q Oh. All you did was review the video after taking Mr. Poole and Ms. Gale's statements?
A No. That wasn't -- that was on April 16th.
I think Mr. Poole and Ms. Gale's statement was after that.
Q Okay. So you reviewed video on April 16th -- or of April 16th. But that was prompted by Ms. Gale and Mr. Poole's complaint or was there another prompt for





that?
A No. That was prompted by just Ms. Gale.
Q Okay. And, just to clarify for the record, you don't recall exactly how or when you received that information from Ms. Gale: It was in person but you don't recall where it took place; is that right?
A Correct.
Q And what do you recall specifically about what Ms. Gale told you that resulted in pulling the video for the April 16th incident?
A I recall that, again, she had said that Mr. Weekes was stretching athletes and she felt like it was inappropriate.
And I would have asked for the date, time, and location, which prompted me to get the video footage.
Q Did she tell you that -- did she tell you where the location was where he was stretching the girl?
A The weight room, I believe.
Q Did she describe the circumstances regarding her discovery of that situation?
A I don't recall. I just recall that again, it was, you know, inappropriate stretching of athletes.
Q Okay. It wasn't inappropriate stretching of a specific athlete?
A At that time, no. I don't remember, at that time, it





being a specific athlete, no.
Of course, afterwards, I know what she is reporting now. And that she is reporting a specific athlete.
But at the time, no.
Q All right. Well, now -- and, again, I'm assuming this former student is now an adult.
But who do you understand that she was referring to now?
A S[redacted] M[redacted].
Q Is that M[redacted]?
A I think so.
Q And do you recall -- if I prompt your recollection, do you recall Ms. Gale saying that she and Mr. Poole were locking up the facility for the night?
A No.
Q Do you recall Ms. Gale indicating that the lights were out when she entered the room?
A Back then, I -- I don't recall.
Like, again, my recollection of that report back then was, you know, inappropriate stretching in that area.
Again, with what she is reporting now -- I mean, she provided the statement. So I see that that's what she is reporting now. But back then, no.

Q Do you recall Ms. Gale telling you at the time that when she entered the room that Mr. Weekes and Ms. M[redacted] popped up from the ground as though they had been caught?
A No.
Q And what do you recall about Mr. Poole's statement regarding the stretching and that incident?
A Again, I just recall that -- you know, that the two of them had come over. And, again, they were reporting that Mr. Weekes was stretching and they felt like it was inappropriate.
Q And do you recall whether or not Mr. Poole and Ms. Gale indicated that Mr. Weekes was alone with the student in the weight room at the time?
A I don't remember Mr. Poole being involved in the report about the weight room at all.
Q All right. Do you recall whether Ms. Gale indicated to you that Mr. Weekes was alone with the student in the weight room at the time?
A I don't recall that.
Q Would that have been an important consideration in the investigation?
A Yeah, probably.
Q Why is that?
A Well, because, you know, going back to





appropriateness, educational purpose, just being alone with a female student would be inappropriate or a boundary invasion.
Q Okay. So that in itself would constitute a boundary invasion; is that correct?
A Uh-huh.
Q Is that a "yes"?
A Yes.
Q But you don't recall whether or not that was a consideration you made during your investigation of that incident?
A No. Again, what I recall the report being was inappropriate stretching of a female athlete.
Q Right. But in the course of your investigation, do you limit what you are investigating to the specifics of what you have been told about what took place or are you investigating the entire situation in terms of what took place?
A Yeah, I would be looking at the entire, sort of, situation.
Q In your role as an investigator, it would be important to determine whether or not the coach was alone with the student athlete in the weight room at the time; isn't that correct?
A Yeah, it would be important.





Q And do you recall ever making that conclusion?
A Well, what I recall was, again, the date and time provided from Ms. Gale was that -- you know, it was requested that the tape be pulled for that specific location, date and time.
Typically when we pull tape, we request that, you know, they look before and after; a little bit before, a little bit after.
So, you know, like, the set time was 5:00, we would say, "Hey, go back and look between 4:00 and 6:00; pull up that camera."
Because those cameras allow you to see activity in a location. So when you pull it up, you can see, on the bar down below, whenever there is any activity in that camera because they are motion-activated.
So in the case of April 16th video, there is no motion or activity that begins until, like, 5:06, which would be the first activity where you can see the door open, you can see students come in, you can see Mr. Weekes, you can Ms. Larson, you can see Mr. Weekes stretching a female athlete, until the video stops and the motion ends.
So, again, I believe we had captured what was reported.
Q What do you recall regarding the motion sensitivity





of the cameras regarding what motion is required to start the camera and then how long does the camera run if motion stops?
A I don't know the specifics on that.
Q And did you have any concern that -- well, strike that.
So what you are saying is that the concerns that Ms. Gale brought to the district and that Mr. Poole brought to the district -- or strike that; that Ms. Gale initially brought to the district regarding stretching of a female athlete in the weight room were unsubstantiated based on your investigation?
A Yes.
Q All right. But you don't recall, at this time, whether or not you investigated -- well, strike that.
What conversation did you have with the student athlete in the course of your investigation about what took place?
A Which student athlete?
Q I believe you said it was S[redacted].
A Yeah. So in the course of the investigation, which is ongoing, S[redacted] had reported that she wasn't even associated with the program at the time.
Q What program?
A The high school track program.

Q All right. So if Mr. Weekes was stretching her in the weight room, he would have had no reason to be doing that; is that right?
A She wasn't there.
Q [redacted] [redacted] wasn't there?
A No.
Q So when did you interview [redacted] [redacted]?
A I didn't interview her. We had a third-party investigator interview her.
Q At the time Ms. Gale reported to you the April incident -- first of all, what year was that: April 16th, what year?
A 2019.
Q Okay. At the time she reported the incident to you, did she identify the student that was being stretched?
A No. I don't recall that at all.
Q Did you ask who the student was who was being stretched?
A No. Again, the report was that -- it was more general, in that Mr. Weekes was down in that area, the weight room, and was stretching female athletes, and it was making people uncomfortable.
Q Okay. I think I'm understanding now: You are talking about the initial complaint.





What was the next complaint that you received from Ms. Gale regarding Mr. Weekes?
A Based on the video that we had saved, again, it would have been in and around the 18th of April, I believe it was a similar report that Mr. Weekes was again stretching athletes inappropriately.
Q And who made that report?
A I think Ms. Gale.
Q Okay. And how did you receive it?
A Again, verbal.
Q Okay. Was that over the phone or in person?
A Probably in person.
Q And what do you recall specifically about what Ms. Gale reported to you?
A Again, the same type of report; that Coach Weekes was stretching athletes again; felt like it was inappropriate.
I would have requested time, date, location of the incident; and then captured video of it.
Q Do you recall whether she said "athletes" or did she say "female athletes"?
A "Female athletes."
Q And you said that was April 18th, also of 2019?
A I believe so.
Q So was that approximately two days after the initial





report she made to you?
A I believe so, yeah.
Q But this report was a separate -- was it regarding a separate incident or was it just regarding that he is still stretching the girls?
A He is still stretching the girls.
Q Okay. And did you ask her what about the stretching Ms. Gale thought was inappropriate?
A I don't recall asking her that.
Q At that time was the investigation ongoing?
A Yes.
Q Would it have been important to you as an investigator to understand specifically what Ms. Gale's concerns were?
A Yes.
Q Is there a reason you didn't ask Ms. Gale specifically what about the stretching was disturbing to her?
A I don't recall if I asked her or what the conversation was at the time.
Q And you didn't document it?
A Other than the videotape evidence that we archived.
Q So you didn't keep any notes or any -- any notes about your investigation?
A I was not able to find any notes about that.





Q Well, what is the standard procedure when you begin an investigation of this type? I mean, are you supposed to keep a record of what you are doing?
A Yeah, I believe, again, the video was the record.
Q But that's not a record you kept; that is a record that was taken automatically by the school's video system, right?
A No -- well, we have to intentionally record and archive it.
Q All right. And so your testimony is that, regarding the April 16th incident, you reviewed the video, and the video for that day begins at 5:15; is that right?
A I think it was at 5:06.
Q Okay. So the earliest video from April 16, 2019 was 5:06 p.m.?
A Correct.
Q And was that a school day?
A I would assume, if there is practice going on, yes.
Q Is it typical that a weight room isn't used until after 5:00 p.m. during the school day?
A Yeah, it's typical. I think school is released at 3:30. So, you know, practices can last two, two and a half hours. So it's not uncommon that those are being used until 6:30 at night.
Q Well, my question is: Why wasn't there any video

capture what she was seeing, but now she is saying it needed to run prior.
Q Well, okay. Well, we can -- we can debate what her meaning with her statement was.
Well, your testimony is that -- in this situation and what you do as a matter of course, is when you submit a request for video, for an allegation such as this, a boundary invasion, a physical contact with a student by a coach and teacher, that you rely on the person coming to you to give you the time period when it took place; and, in addition to that, you request the video from an hour before and an hour after the time that's given to you by the witness. Is that correct?
A Yes.
Q Okay. So what you are saying is that the time that you requested from the head of security for the video would have been, in this situation, for, at least, the hour before and the hour after the time that was given?
A Yes.
Q Okay. And then regarding preserving the video from that period, what you preserved is what we have received, what has been produced; is that correct?
A Yes.





Q And if Diana Reaume says that she saw the video for the whole day, were you aware that there was additional video that was pulled?
MR. FOBES: Objection, form.
Go ahead.
THE WITNESS: So Diana says she watched the weight room video all day?
Q (By Mr. Gallagher) Well, again, this is from my recollection.
My recollection of her testimony said that you and -- she and you sat down and watched the whole day, the whole video, the whole day. But that may be incorrect.
But what you are saying is that you only had requested the hour before and the hour after the incident that was alleged by Pam Gale?
A That is -- that's pretty standard in terms of, again, like, trying to capture an incident.
Q Right.
A But, theoretically, you could pump that weight room camera for the entire day, you could look at it; but it would show you where there is activity in that.
So, you know, you can start at 8:00 that morning to 10:00 that night. The line down at the bottom is going to show you the hours of activity that occurred





in that area for the day.
Q Okay. But at that time, anyway, you didn't speak with the student that was allegedly being stretched in the weight room?
A I did not speak with the student, no.
Q All right. And what was the next time that Ms. Gale reported to you regarding Mr. Weekes' inappropriate physical contact with students?
A Again, I believe it was -- must have been between the 16th and the 18th of April.
Q Okay. Well, we have talked about the 16th.
And then you said, around April 18th, she reported his inappropriate stretching of female athletes. And then you said there were multiple reports. So that's two.
What was the next report?
A When her and Mr. Poole came to the district office.
Q Okay. And when was that?
A I don't know the exact date. But it would have been, you know, after probably April 18th, I think; between 18th and the 25th, 26th.
Q And what do you remember about that?
A Again, I remember that they did come to the district office and that they, again, reported inappropriate stretching with junior high students.





Q And what age range are junior high students at the district?
A Grades 7th and 8th.
Q And was Mr. Weekes coaching 7th and 8th grade girls at that time?
A Yeah, he would have been the junior high track coach at the time.
Q And what do you recall Mr. Poole or Ms. Gale telling you about that?
A Again, just that Mr. Weekes was stretching junior high students and they felt like it was inappropriate.
Q What about Mr. Weekes stretching junior high -- was this girls?
A Yeah.
Q What about Mr. Weekes stretching junior high girls did they feel was inappropriate?
A They didn't elaborate, I don't believe.
Q Well, what questions did you ask them?
A Again, I don't remember, exactly, the exact context of the conversation. I just remember that the report was similar to the ones that she had made previously about him stretching female athletes and feeling like it was inappropriate.
Q But you don't recall asking her what she felt was

inappropriate about the stretching?
A I don't recall asking her, no.
Q Did you ask Mr. Poole what was inappropriate about the stretching?
A I don't recall asking them.
Q Why wouldn't you ask them, "Well," what they felt was inappropriate?
A I don't know if -- I'm not saying I didn't. I just don't recall asking them.
Q And, once again, did you document that meeting?
A I did not.
Q Why not?
A I don't know why.
Q Would it have been appropriate for to you document the meeting in your role as the Title 9 person and the person investigating these allegations?
A Yeah.
Q Was that a failure on your part?
A I believe that we had reached out to the risk pool after the last report or having multiple reports of the same issue.
So, yeah, if I did not document, which I could not find any documentation of it, and I don't have it, then yes.
Q Is it your testimony that that was the final report





from the people, Ms. Gale and Mr. Poole, regarding inappropriate stretching?
And the reason I ask this is because you said, after the final report, you reached out to risk pool.
I don't want to jump ahead if we have more reports from them about inappropriate contact with female students; I'd like to cover those as well.
A Those are the ones that I remember.
Q Okay. And did you reach out to the risk pool?
A Well, again, I would have -- each time I have a report like that, I will let the superintendent know. And typically she is the one that would reach out.
Q And that was Diana Reaume?
A Uh-huh.
Q Is that a "yes"?
A Yes.
Q The reason I keep asking you if that's "yes" is because the reporter -- there is no way to tell on the record if "uh-huh" is a "yes" or a "no."
A Sorry.
Q So it's important to articulate with actual words.
A Got it.
Q You know, it's no problem at all. It happens all the time in depositions. Duncan and I have been dealing with it for 30 years.





MR. GALLAGHER: Right, Duncan?
MR. FOBES: Exactly: Uh-huh.
Q (By Mr. Gallagher) And I'll just remind you. Just don't take offense. I'm not trying to be a teacher and correct you.
All right. So you are saying each time you received contact from Mr. Gale and/or Mr. Poole, you reached out to Diana Reaume, as the superintendent, to inform her of their assertions or allegations; is that correct?
A Yes. I always report to her.
Q Okay. And I know it's been a while, but do you recall how you reported to her these allegations?
A Well, our offices are 20 feet apart. I probably would have went in and had a conversation with her.
Q And what did Ms. Reaume say in response to your representations to her?
A I don't recall.
Q But at some point you recall that risk pool was contacted.
Was that by you and Ms. Reaume? Or do you know who did the contact?
A I think that she initiated the contact.
Again, this was after the third result from Mr. Poole and Ms. Gale.





And then I believe we, you know, kind of, shared the reports and the information that we had and what we had observed on the videos.
Q And do you recall when that took place?
A Again, I think on or before the 26th of April.
Q And what else did you do in your investigation of these allegations?
A Archived the videos, and then produced a letter of direction to Mr. Weekes.
Q And we'll get to that.
But did you have any conversations with Mr. Weekes about this issue?
A I did, on April 26th.
Q Where did that take place?
A In his classroom.
Q Did he know you were coming or did you just show up?
A I think I had probably prompted him that I wanted to meet with him.
Q And I assume it was just you and him in the classroom at that point?
A I believe so.
Q And what was discussed? What did you say?
A I shared with him that there had been reports made about him stretching female athletes, and that it was making people uncomfortable, and that I was directing

A Correct.
Q All right. And you don't have a full recollection of what took place at that meeting?
A No, I don't.
Q Okay.

(Exhibit No. 8 marked)

Q (By Mr. Gallagher) All right. Looking at Exhibit 8 to your deposition, have you seen this document before?
A Yes, I have.
Q All right. And it appears to be an email from Pam Gale to Brian Weekes, dated April 20, 2022, at 9:53 a.m., in which he says: "Meet you any time," in response to an April 20, 2022, 9:22 a.m. email from Mr. Weekes, in which he wrote: "We need to have a meeting about why you are saying things to students about me and how to act around me. This conduct has not only spilled over on the track and at practice, but it has also gotten into the school and classroom. If I have done something, I need to know what. But I feel that the conduct of most of the HS staff to me has been totally unprofessional, and not in keeping in trying to build a unified program for the district. I'm available most any time after school. I have not gone to Kyle yet. But, at this point, I







do believe I have enough examples to and information to file harassment. Mr. Brian K. Weekes."

And then Pam responded by saying: "Meet you any time."

Were you first made aware of this exchange in the course of this discovery in this litigation or were you aware of it prior?
A I think in the discovery of this litigation.
Q All right. And were you aware that, at any point in time in 2022, that Mr. Weekes was having issues with Ms. Gale regarding information that was allegedly being shared about him?
A No.
Q Okay. And did Mr. Weekes, at any time, consult with you about opening a harassment charge against Ms. Gale?
A No, not a harassment charge.

I think -- after I had met with him and given him that directive not to stretch female students, I think he had complained, you know, again, felt like -- feeling like he was being targeted, or picked on, or something. But it say, like, "harassment" or that they were involving other people.
Q And did you advise Mr. Weekes about his concerns at all?







A Again, I just remember trying to be perfectly clear that he needed to stop; and, you know, it wasn't really up for negotiation.
Q And I don't know if you addressed it previously. If you have, I apologize.

But why did you want him to stop?
A Because, again, in multiple reports. And it was, you know, making folks uncomfortable. And we had, again, consulted with the risk pool, and advised that he just needed to stop.
Q And you made the determination that he needed to stop his physical contact with the students without actually speaking with the students themselves; is that right?
A I did not speak with the students themselves.
Q All right. And is there a reason you didn't choose to speak with the students or? I mean --
A Again, I believe the videotape had captured what had been reported. We were able to see everything that had been reported on the videotape. It didn't appear to be inappropriate.
Q Okay.

(Exhibit No. 9 marked)

Q (By Mr. Gallagher) And Exhibit 9 to your deposition -- well, before we get to Exhibit 9:







Your testimony is it didn't appear to be inappropriate behavior, and yet you directed him to stop engaging in the behavior.

So if it was not inappropriate behavior, why would you direct him to discontinue the behavior?
A Again, after consulting with the risk pool and sharing information that had -- that we'd had, that was the recommendation.
Q Okay. And then looking at Exhibit 9 to your deposition, have you seen this document before?
A Yes.
Q All right. And she says she is writing a statement August 14, 2024.

Is that about the time you received the statement or did you receive it?

How did it come into the district?
A I think it was given to Mr. Kaiser.
Q Okay. Okay. And Mr. Kaiser forwarded it to you, I presume?
A Yeah, to the district.
Q Okay. Have you reviewed this document, and have you taken any action to investigate any of Ms. Gale's allegations in this document --
A Yes.
Q -- aside from what you have already testified to?