UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KARI L. LARSON, )
)
Plaintiff, )
)
vs. ) No. 3:24-cv-05716-BHS
)
QUILLAYUTE VALLEY SCHOOL )
DISTRICT, BRIAN WEEKES, AND )
KYLE WEAKLEY, )
)
Defendants. )

DEPOSITION OF ROBIN POOLE
Taken in behalf of the Plaintiff
AUGUST 26, 2025
***TAKEN VIA ZOOM VIDEOCONFERENCE***

Reported by Jacqueline Lee Butler
RPR, CSR, CCR

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of ROBIN POOLE was taken in behalf of the Plaintiff, before Jacqueline Lee Butler, Registered Professional Reporter, Oregon Certified Shorthand Reporter, and Washington Certified Court Reporter, on Tuesday, the 26th day of August, 2025, commencing at the hour of 9:30 a.m., the proceedings being reported and all parties appearing via Zoom conference.

APPEARANCES

For Plaintiff:

Daniel Charles Gallagher
Gallagher Law Office P.S.
10611 Battle Point Drive NE
Bainbridge Island, WA 98110-1493
(206) 855-9310
dan@nwprolaw.com

Rachel Lynn Anyan
Anyan Legal Services LLC
21833 36th Avenue NW
Stanwood, WA 98292
(714) 227-3205
rachel@anyanlegalservices.com



APPEARANCES (Continued)

For Defendant Quillayute Valley/Weakley:

Duncan K. Fobes
Patterson Buchanan Fobes & Leitch, Inc., P.S.
1000 Second Avenue, 30th Floor
Seattle, WA 98104
(206) 462-6700
dkf@pattersonbuchanan.com

For Defendant Weekes:

Grace Cowan
Vandeberg Johnson Gandara PS
1201 Pacific Avenue, Suite 1900
Tacoma, WA 98402-4315
(253) 383-3791
gcowan@vjglaw.com

Also Present: Brian Weekes

* * * * *



EXAMINATION INDEX


Examination by Mr. Fobes Page 6
Examination by Mr. Gallagher Page 52
Further Examination by Mr. Fobes Page 59


EXHIBITS MARKED FOR IDENTIFICATION:
(NONE)

REQUESTS FOR PRODUCTION:
(NONE)

INSTRUCTIONS NOT TO ANSWER:
(NONE)

* * * * *



P R O C E E D I N G S

MR. FOBES: Okay. So, Jacqueline, do you want to maybe do a roll call of the lawyers and make sure we have everybody that's going to participate?
And my name is Duncan Fobes. I represent the Quillayute Valley School District, and I've noted this deposition today.
MR. GALLAGHER: Dan Gallagher representing Plaintiff Kari Larson.
MS. ANYAN: And Rachel Anyan, also representing Kari Larson.
MR. FOBES: Ms. Cowan, can you hear us?
MS. COWAN: Apologies. Were you waiting for me? I had to run to the restroom.
MR. FOBES: Okay. Is everybody -- and then, Ms. Cowan, I guess your client's also observing the deposition today.
MS. COWAN: Yes. Yes.
MR. FOBES: Okay. Is everybody ready?
MR. GALLAGHER: All ready.
MR. FOBES: All ready.
Mr. Poole, I'll go ahead and get started with your -- with your deposition, and I'm going to ask you questions. I'm going to start just, you know, a

this kind of situation. I mean, I can't exactly define, but if you and I was to see it, you would probably agree with me that it was inappropriate.
Q Have you ever seen, personally, observed Mr. Weekes with his -- while massaging put his hand up underneath girls' shorts?
A Yes, sir.
Q Okay. When did you first observe that?
A The first season of 2018 season.
Q How often did you see that?
A It was a rare occurrence. I'm not going to say it was every day, every minute. It was usually at the end of practice. A lot of people are gone. They've already gone, and, you know, because there's some -- some of that stuff -- you do stretching exercises and stuff like that, but this massaging stuff was -- like I say, it was -- I don't say every time he massaged them he reached underneath their things, but on occasion he did.
And, like I say, I only saw it probably the first season probably, say, maybe three times because, like I say, I don't go over to that section of the field very often. But when I saw it, I did tell Pam. I says, "Pam, this is -- I don't think this is right." She agreed. And then, like I say, the season ended; so

Page 22

problem resolved, you know.
Q Did you talk to Mr. Weekes about it?
A No. Because I'm a subordinate. So Pam -- I'm not sure if she talked to him or not. But Pam is the head coach. I go through the chain of command. Having been in the military, I kind of understand that chain of command concept. So I just said, "Pam, you're the head coach. You got an issue. We got an issue. I'll back you, Pam, but you're the one that is supposed to be addressing these concerns." So I can't remember if she said she talked to him or not.
Q When you said you were a subordinate, was that because you were an assistant coach? Is that what you meant?
A That's what I mean, yes.
Q So during that first year, which was spring 2018, first season -- I'm sorry -- spring 2018, did you make any reports to Mr. Weakley or any other administrator?
A No. Like I say -- I'm sorry for interrupting. Yeah. The season had ended so we -- case closed, so to speak.
Q So you made no reports to district administration about this?
A Not the first year, no.

Page 23

Q Okay. Let's go to the second year. What conduct did you observe personally that made you concerned?
A Well, same kind of scenario. I would on occasion go down and talk to Pam about something, and there again I saw it again. I'm like, "God, Pam." And then one time we had a -- I'm trying to remember if I was walking --
Anyway, I was walking down the hallway to exit the building, and on my right side is a weight room. And when we were walking by the weight room, all of a sudden Mr. Weekes and this girl sit up, and I know the lights were out because that's -- like I say, my charge is to make sure that building is -- that thing is controlled or shut down properly, and I -- but I can't determine for sure if the door was locked. I always usually checked the door and make sure it's locked, and then the light's on. That's my charge of -- as far as taking care of that particular weight room.
And they stood up. And the reason nobody could see them is they were right next to the wall. But when they stood up, obviously you could see them, and they kind of -- well, it's subjective, I know, but he looked guilty. And Pam went to, I believe, Mr. Weakley and asked if I she could see the film because they're

Page 24

supposed to have film in this room. And the -- he showed her some film, but Pam said it wasn't the right time frame. So I don't know. But I've never seen the film or anything about that, but Pam said something about she had seen some film, but she didn't think the film carried on long enough to see what was actually going on.
Q Okay. Let me walk you back through this incident. So you were going down the hallway where you could see the weight room; correct?
A Yes. It's the hallway exit.
Q And the hallway is where?
A Between the wrestling room -- we got a gym, a wrestling room, which -- and it's all hallway. Then you got some offices. Then you got this weight room. And then, at the end of the hallway, is an exit of the building, and that's usually one of the exits we usually use to leave the building.
Q And what was your purpose in being present in that location at that time?
A Leaving the building.
Q Leaving the building?
A Practice was done.
Q But did you have some duties that you were performing as you left the building?

Page 25

the wall is only three feet tall. Had he been standing, I would have seen him as I was walking down the hallway. The only reason I saw him is because he either got up on his knees or he stood up. I can't remember exactly what he did, but he was -- and then the girl stood up, and then they were right by the hallway. So, like I says, it's about a three-feet wall.
Q How close he was to the -- how close was he to this girl when you first saw them?
A Right next to each other.
Q Do you know who this girl is?
A I got a poor memory when it comes to a lot of these names because you get several of them a year, but I think S[redacted] something, but I'm not sure if that was -- don't quote me on that. Pam, I think -- Pam is real good with names, and Pam knows people's names; so she would be able to articulate who it was.
Q And do you know if S[redacted] was a high school student or a middle school student?
A That's a good question. I don't know.
Q That's fine. If you don't know the answer to a question, just tell us that. Okay?
A Yes, sir.
Q So when this incident happened, you saw Mr. Weekes and this -- the girl. What occurred next?



What happened next?
A They just gathered their stuff and left the building, I guess, if I remember right.
Q Did you have any conversation with Mr. Weekes or the girl?
A No, sir.
Q Did you -- was Pam Gale present with you?
A Actually, I think she was just a little bit behind me, within two to three steps, at the most.
Q And did you talk to her about this, what you'd seen?
A Yeah. We was walking out to the car, and I said -- excuse my language. I said, "What the hell was that about?" And she says, "Yeah. That's what I'd like to know." That's when she wanted to see the film.
Q Did you see what Mr. Weekes and this girl were doing --
A No, sir, I did not.
Q -- before you saw them -- okay. And my question was, before you saw -- before you saw them standing up, do you know what they were doing?
A No. Just conjecture. I have no idea.
Q So when you spoke with Ms. Gale, what conversation did you have at that time?
A Well, it's just -- every year we have to go



through, I don't know, 10, 12 hours of different programs to become a coach. And all of these different programs are talking about grooming and head concussions and blah-blah-blah, and one of them is what is a no-no and what is acceptable. You can't have a student in a locked room in a classroom. You can't have shades pulled if there's a student in the classroom. You can't isolate yourself with students. There's various things like that are structured. They are set up. You're told -- you're told many, many times that you cannot have --
Even if there's nothing going on, it just does not look right. It is hard to defend something like that; so you just don't put yourself in a compromising situation. So -- and, like I said, I mean, it's conjecture, but, God, he looked guilty. I mean, he just had this "Huh-uh." Had he not stood up, we would not have seen him. But what he was doing, I have no idea because there was a three-foot wall there. So I like to think he was not doing anything, but I don't know.
Q So when you were talking to Ms. Gale out in the parking lot, did you or she decide to do anything about this?
A Well, that's where the -- that's where the time frame gets a little bit foggy for me, but I'm



thinking -- this incident -- then I think I saw him massaging somebody one more time. That's when I approached Mr. Giles. Like I said, he was a school board member. And I told him my concerns, and he says, "I'll give you one week. You report it or I will." That's when I went to Pam. I'm not sure -- that wasn't -- I think there was one other incident after that weight room incident that I saw in the field out there, and I said, "That's it, Pam."
So that's when we approached -- she got a meeting with Mr. Weakley, and we went in and discussed with Mr. Weakley our concerns.
Q So you went with Ms. Gale at that time?
A Yes, sir.
Q And you spoke with Mr. Weakley. Was there anybody else present in this conversation?
A No. No. Just the three of us.
Q Okay. What did you tell Mr. Weakley?
A Like I said, this is tough stuff to do because you don't want to, you know, victimize a person because maybe -- it's hard to put motives on actions and consequently you don't want to ruin a career, his job, his marriage, you know. So we were pretty -- how would you say? We didn't get into graphic details of this and that. We just told him that you might want to talk to

Mr. Weekes about a no-hands policy. You know, keep his hands to himself, you know. Words to that effect is the best I can remember.
Q Did either you or Pam Gale tell Mr. Weakley that Mr. Weekes had placed his hand up underneath girls' shorts?
A I am not sure about that. I don't know if we got that graphic or not.
Q Then was there a conversation about viewing video of the space of the weight room?
A Pam requested to see the video, and she saw a video. I never saw any video. But Pam saw a video. And she said, from what she can tell, the video did not last long enough to see the time frame that we were in.
Q How do you know she saw a video?
A Because she said so.
Q Okay. But you weren't there?
A No, sir.
Q Did you talk to Mr. Weakley any further about this weight room incident apart from what you've told us today?
A I'm not sure if I talked to Mr. Weakley about the weight room incident. I think Pam did. But I do not know if I did or not.
Q I'm sorry. But you were present when Pam

Page 34

talked about it; correct? Or were you?
A Probably not because Pam went in to talk to him about viewing the video, and I was not there present when she went to go ask him to see the video. She told me she was going to see the video.
Q Okay. I think I'm confusing myself. When you went to Mr. Weakley, what were you going in to report?
A Pam and I went in there to address our concerns about inappropriate -- what we considered inappropriate contact with young girls in areas that were -- well, just genital areas, basically.
So we were concerned that they were getting to close, too much touchy, just -- all we wanted to do was just resolve the problem. "Just keep your hands to yourself." It's a simple solution.
And, as far as I know, Weakley -- Mr. Weakley addressed it, and he told him, and I never saw it again the rest of the season.
Now, what's gone on since then, I'm not really privy to because I don't work in the school system. The only time I'm in the school or around the school is during a track season. So whatever happened after that, I don't know, but something has obviously transpired since then.
Q Did you coach -- did you coach during the

Page 35

spring 2020 season?
A Yes. 12 years continuance, yes.
Wait a minute. 2020. 12 -- so that -- I must have started about --
Q That might have been the COVID season. I don't know.
A We had -- we had one season that was COVID. We only coached two weeks and then we shut down. I think I did -- I'm trying to remember if I did one -- when was COVID?
Q 2020. Early 2020.
A Okay. So then, yeah, we didn't have a season that year.
Q Okay. And then did you coach the season in 2021?
A Yes, sir.
Q '22?
A Yes, sir.
Q '23?
A Yes.
Q And '24?
A Yes, sir.
Q How about '25? That's --
A This last season, yes, sir.
Q Okay. And then after you had your

Page 36

conversation with Mr. Weakley about your concerns, did you ever see Mr. Weekes touching a female student after again?
A No.
Q Did anybody report to you that he -- Mr. Weekes had been touching female students? And this is after you spoke with Mr. Weakley.
A Well, to give you an example, one of the things that promoted my actions was I was walking out to do something on the field there, and Mr. Weekes was massaging a girl, and there was a boy up in the stands, says, "Hey, Mr. Weekes, how would you like to massage me like that?" So that's when I realized --
Like, I was going back to the reference to pornography. I don't -- I can't define it, but I know when I see it. Well, obviously this kid saw something. But see, I'm not sure if I was making up my imagination thinking bad thoughts, you know. But when I saw a kid say -- express the same feelings I had, I thought, "No. I am right. This isn't appropriate." Because if a kid's seeing that and saying that, they recognize it. Well, that's the time to start doing something.
Q In what year was this that you heard this boy make the comment?
A Probably the second year, the 2019, I think,

Page 37

is what we've talked about, I believe.
Q Before you reported to Mr. Weakley; correct?
A Yes, sir.
Q When you went to make your report to Mr. Weakley, did -- did you talk about the weight room incident?
A I did not, no. We just talked about the hands.
Q Did you ever see -- you mentioned touching of genitals. Did you ever see Mr. Weekes touch a student's genital area?
A No. But if there's a definition of genitals, I mean, if you were within two or three inches of a genital area, that's proximity that shouldn't be allowed. And when you take -- I mean, damn near your fingers are just about disappeared underneath the shorts, and those shorts are pretty short, some of them. That's getting way too close to anything that should be massaged or therapeutic or whatever the heck he thinks he was doing.
Q Other than this conversation with Mr. Weakley that you've told us about, did you ever make any other reports to Mr. Weakley about your concerns about Brian Weekes?
A No. Like I said, to the best of my knowledge,



I never saw further activity from Mr. Weekes; so problem resolved, as far as I was concerned.
Q Did you ever see any other coaches massaging or stretching students physically?
A I've seen other kids stretch other kids. You know, leg stretches, that kind of stuff. I don't think so. But we have limited staff. I mean, we have three in our track program. I think Mr. Weekes had three in his staff. A lot of the times is two ladies; so, you know, they weren't nothing to be concerned about.
Q Is there -- was there ever an incident where you involved -- or learned of something involving high jump?
A Explain that again.
Q Was there ever an incident that you saw or learned about involving high jump?
MR. GALLAGHER: Object to the form.
MR. FOBES: Sure.
BY MR. FOBES: (Continuing)
Q You can answer the question.
A Not to my knowledge, no.
Q Okay. Do you know Kari Larson?
A Yes, sir.
Q How well do you know Kari Larson?
A Well, as a student, as an athlete. She was in



our track program for several years and then she eventually became an assistant coach for us, in that capacity. That's how I know her.
Q When she was an assistant coach, did you -- was she in your track and field program?
A Yes, sir.
Q Okay. So how closely did you work with her in that program?
A Probably -- basically never because she was a running coach, a long-distance running coach. It has nothing to do with my program. So I just saw her then in, you know, bus rides and track meets and once in a while on the field. We talked stuff over once in a while, but that was about it.
Q Did you ever observe any what -- conduct that what you felt to be inappropriate by Mr. Weekes towards Kari Larson?
A I never seen anything, that I can think of.
Q Have you ever heard Mr. Weekes make any inappropriate comments to Kari Larson?
A No. My interaction with Mr. Weekes and Kari was rather limited.
Q Did you ever hear Mr. Weekes make any what you felt to be inappropriate comments towards students?
A He made some reference one time, and I



can't -- I think he bring it up, but I can't remember exactly the details. Something about some girl's breasts one time, I think, if I remember right.
Q And were you a witness to this?
A Yeah. But I can't remember when it happened, who it was, what the time frame was, what year. I can't remember -- I just remember -- I thought, "Jeez," you know.
But, you know, it's one of those things where you just hope it's being brushed off and nobody's paying attention to it; so you just kind of let it slide.
Q Did you report that?
A No, sir.
Q Did you ever have a conversation with Ms. Larson about drinking?
A This -- the setup for that was, we were at a state track meet. We settled everybody in. We're down in the lobby; and Pam, Kari, and I were down in the lobby, and there was a bar down there. I says -- I says, "You guys want to go over and get a drink or something? I'm going to get a beer. You guys want a pop" or something like that, because, to the best of my knowledge, Kari never drank.
But anyways, when I was walking to the bar, I says, "Yeah," I said, We got to get Kari in this bar,"

and I said, "I know she likes to drink. She likes to drink a lot," or something -- some silly thing; right? I never, ever heard anything -- ever heard of her drinking anything except pop or water or whatever. Well, that night it hit a raw nerve, and Kari apparently went up to Pam's hotel room and told Pam, "What does Robin know about my drinking?" And Pam says, "You know Robin. He just jokes around. He's just being silly. Why?" And then the dam burst for her because apparently, somewhere, after reading your paperwork that you guys sent us that he had said something that she likes to drink or something -- did he say that to Pam? I believe. I'm not sure that's correct or not.

But anyways, what I said was a joke, was the straw that broke the camel's back, so to speak. And then she started confiding in Pam about all kinds of stuff in the -- in the hotel room. And they said -- she said -- Pam said they stayed up till 3:00.

Now, what they talked about, they never shared with me, neither one of them. But Pam says, "Oh, it's not nice." I says, "That's unfortunate," because Kari is a very nice, lovely young girl, but she's rather sheltered and naive kind of a person, you know. Gullible or whatever you want to call it.

Q So your comment about Kari drinking, that was



just a joke on your part?

A Yes, sir.

Q Okay. And then you -- when Kari talked to Pam Gale about this, you weren't present for any conversation between them?

A About what now?

Q Were you present for any conversation between Kari and Pam Gale about?

A No, sir. They are real good buddies. They keep confidential. I don't get into it. No.

Q Have you ever discussed Kari Larson's claims with her?

A No.

Q Okay. Have you talked to anybody about the claims or issues in this lawsuit?

A No. I've made reference that "I got a deposition coming up. There's something going on between Mr. Weekes and Kari." But, you know, generic stuff.

Q What paperwork have you viewed about this case?

A I just got some paperwork from the law firm. I can't remember the name of the law firm. And it's spelled out -- and I was shocked for how long this thing had apparently been going on.



Q Do you remember what paperwork it was, or what the document was called?

A Court documents. Court documents of some sort.

Q It was a court document?

A Must be like the charges, maybe, or whatever. You know, what is alleged to have occurred, you know. One of those kind of formal court paper-type things.

Q Have you ever spoken with Mr. Brian Weekes about the issues in this case?

A No, sir.

Q Let me just check my notes here. Just a minute.

A Sure.

Q In fact, why don't we -- why don't we take a five-minute break here, if that's all right with you.

A Fine with me.

MR. FOBES: Okay. Let's come back at 10:37.

(A short break was taken.)

MR. FOBES: I don't have any other questions for you right now. I'll pass this to other attorneys so that they can ask their questions. I might have some follow-ups after that.

MR. GALLAGHER: Yeah, I have a few



questions for you, Mr. Poole.

EXAMINATION

BY MR. GALLAGHER:

Q My name is Dan Gallagher. I'm one of the attorneys representing Kari Larson in this matter. Can you provide any more detail about the documents that you received notifying you of this deposition?

A Of the documents I received? It was -- I think just a standard court-type document that lists the information or allegations or whatever you want to call it.

Q Okay. Like a complaint? It has all the allegations in it?

A I believe that's -- to the best of my legal expertise, yeah.

Q You would have received a subpoena, which is a directive to appear.

A Yeah. Yeah.

Q It said "Appear," you know, "on this date, August 26, at 9:00 a.m.," or whatever; right?

A Yes, sir.

Q Okay. But you're saying you also received a document that identified what Ms. Larson's concerns were, what her complaint was?