UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KARI L. LARSON,

                     Plaintiff,

      v.

QUILLAYUTE VALLEY SCHOOL
DISTRICT No. 402, BRIAN WEEKES,
and his marital community, KYLE
WEAKLEY, and his marital community,

                  Defendants.

CASE NO. 3:24-cv-05716

ORDER

THIS MATTER is before the Court on plaintiff Kari Larson's motion for partial summary judgment, Dkt. 61, defendant Brian Weekes' partial motion for summary judgment, Dkt. 83, and defendants Quillayute Valley School District and Kyle Weakley's motion for summary judgment, Dkt. 86.

Larson contends that Forks High School head girls cross country coach, defendant Brian Weekes, sexually harassed and discriminated against her while she was his assistant coach. Dkt. 20-1 at 8. She sued Weekes and QVSD in August 2024, asserting that QVSD is vicariously liable for Weekes' actions. Dkt. 1. Larson amended her

ORDER - 1

complaint to add QVSD assistant superintendent and athletic director Kyle Weakley as a defendant in February 2025. Dkt. 20-1 at 8–11.

Larson asserts Title VII and Washington Law Against Discrimination ("WLAD") claims against Weekes for sex discrimination and retaliation. Dkt. 20-1. She also asserts assault and battery claims against him. *Id.*

Larson asserts Title VII and WLAD claims against QVSD for hostile work environment and retaliation,[1] and negligent retention and supervision claims against QVSD and Weakley ("the District"[2]). *Id.*

Larson's motion asks the Court to dismiss QVSD's affirmative defenses, arguing that it failed to provide any factual support for them during discovery. Dkt. 61 at 1. She also seeks summary judgment on her hostile work environment claim, asserting that there is no genuine dispute that Weekes subjected her to unwelcome verbal and physical harassment, and that his conduct was sufficiently severe to alter the conditions of her employment. *Id.* at 1–2.

Weekes denies the allegations against him. Dkt. 71-1 at 9. He seeks summary judgment on Larson's Title VII sex discrimination and retaliation claims, arguing that

---

[1] Larson contends that her amended complaint asserts a WLAD retaliation claim against Weakley. Dkt. 112 at 20. Weakley argues that Larson made no such claim. Dkt. 118 at 12. However, Weakley cites to the incorrectly filed version of the amended complaint, Dkt. 19. Larson filed the correct version, Dkt. 20-1, later that same day. Larson's operative amended complaint asserts a WLAD retaliation claim against QVSD but does not assert this claim against Weakley. Dkt. 20-1 at 9–10.

[2] QVSD and Weakley share counsel, pleadings, and this motion. Unless the context requires specific identification, this Order refers to both defendants as "the District" for clarity and ease of reference.

ORDER - 2

individuals cannot be held liable for these claims as a matter of law. Dkt. 83. Larson does not oppose this motion. Dkt. 110. Weekes' motion on Larson's Title VII claims, Dkt. 83, is therefore **GRANTED, and those claims against Weekes are DISMSSED.**

Weekes also seeks summary judgment on Larson's WLAD retaliation claim, asserting that Larson fails to show that she suffered an adverse employment action when Weekes removed her name from athletic.net. He further contends that Larson's retaliation claim fails because Weekes was not her employer, her alleged refusal of Weekes' sexual advances is not a WLAD-protected statutory activity, and because Larson fails to show that her actions caused any adverse employment action. Dkt. 117 at 2–5.

The District seeks summary judgment on all claims against it. Dkt. 86. It argues that even if Larson was subjected to a hostile work environment, her claim is time-barred because she did not report a violation to the Equal Employment Opportunity Commission (EEOC) within 300 days of a discriminatory act. Dkt. 86 at 2. It also argues that it is not vicariously liable for Weekes' conduct because Weekes was not her supervisor, the District had no knowledge of Weekes' actions until Larson reported it, and it is undisputed that the District took immediate curative action once she finally did report it. *Id.*

The District also seeks summary judgment on Larson's Title VII and WLAD retaliation claims, asserting that Larson fails to establish that she suffered a materially adverse employment action. Even if she did, the District argues that there is no evidence that Weekes removed her name in retaliation for opposing his sexual advances. *Id.*

Lastly, the District argues that Larson's state law negligent supervision and retention claims are duplicative of her employment discrimination claims and must be dismissed. *Id.*

Larson replies that Weekes subjected her to years of a hostile work environment, and that the District is vicariously liable for Weekes' actions. She contends that there is no dispute that the District had knowledge of Weekes' sexual harassment of student athletes and yet it took no prompt or remedial action to correct or prevent his behavior. Dkt. 61 at 27. Larson contends that in addition to removing her name from athletic.net, Weekes retaliated against her by subjecting her "to years of flirtatious or suggestive text messages at all hours of the day" after she objected to his sexual advances. Dkt. 112 at 21.

## I.   BACKGROUND

In 1997, QVSD hired Weekes as a teacher and head coach of the Forks high school and middle school cross country teams. Dkt. 88 at 2. Weekes and Larson have known each other for most of Larson's life as she grew up attending cross country and track meets with her older siblings. Dkt. 62-1 at 4. Weekes coached Larson in cross country and track for six years and also coached her youth soccer team. Dkt. 62-2 at 1. In 2015, Larson started volunteering with the high school cross country and track programs. Weekes wrote a letter to QVSD on Larson's behalf, recommending she be hired "for any position which she applies." *Id.* In 2017, QVSD hired Larson to be the assistant girls cross country and track coach. *Id.* She was 19 years old. Dkt. 62-1 at 2–3.

QVSD requires each of its employees to take annual anti-harassment trainings. Dkt. 88 at 2. Larson and Weekes completed all the required trainings. *Id.*; Dkt. 70 at 5.

**A.      January 2019 misconduct at the Nike Conference**

In January 2019, Larson and Weekes attended the Nike Northwest Track & Field Clinic together. Dkt. 20-1 at 4; Dkt. 62-1 at 8. One evening, Weekes invited Larson to his hotel room to watch a movie or play a game. Dkt. 62-1 at 8. Larson alleges that after sitting on the bed to watch a movie, Weekes sat next to her and then "reached over and put his hand inside [her] thigh, up near [her] vagina, and proceeded to rub back and forth and up and down and slowly moved his hand until it was touching [her] vagina." *Id.* at 9. Larson testifies that after she "put [her] hand in between [her] vagina and his hand and pushed it away to try and get him to stop," Weekes "resisted and pushed back, and at that point [Larson] got up and left the room." *Id.*

Weekes alleges that he massaged Larson's thigh at her request to relieve soreness and denies that he touched her inappropriately. Dkt. 71-1 at 9. He testified that Larson told him that he "could go higher" but that he refused. *Id.* at 10.

The following morning, Larson received a text a message from Weekes asking if she was ready to go down to breakfast. Dkt. 62-1 at 10. She responded that she was going to take a shower and then she would be ready, to which Weekes texted "asking if I needed help with that." *Id.* Larson texted Weekes back to never say anything like that to her again. *Id.* After getting ready, Larson knocked on Weekes' hotel room to let him know that she was ready to go down to breakfast. *Id.* Larson alleges that Weekes invited her into his room to talk, and she responded by letting him know she "would never think

ORDER - 5

of him in any kind of sexual or personal relationship, in that way." *Id.* During the conversation, Larson got a text message from her sister. *Id.* at 11. Larson alleges that Weekes asked her if she had told her sister what had happened. *Id.* After she indicated that she had not, Weekes allegedly "asked [her] never to tell anyone what had happened because it could ruin his life." *Id.* Larson agreed not to tell anyone. *Id.* Larson considered not returning to coach cross country in the fall of 2019 but testified that she "wanted to be there for the students." *Id.* at 12.

**B.     April 2019 reports of Weekes' inappropriately touching female middle school and high school athletes.**

Three months later, two Forks High School track coaches, Pamela Gale and Robin Poole, reported to QVSD's Athletic Director, Assistant Superintendent, and Title IX Coordinator, Kyle Weakley, multiple instances of what they viewed as Weekes "inappropriately" touching female middle school and high school track athletes. Dkt. 79-2 at 3. Weakley informed QVSD's superintendent, Diana Reaume, of the report. *Id.* He investigated the allegations by reviewing surveillance video of the time of the incidents. [3] *Id.* Weakley concluded that the videos did not substantiate the allegations and took no further steps to investigate. *Id.* Weakley later testified that he was unable to find any notes or documents concerning his investigative process or findings. *Id.* at 7.

---

[3] Gale also attempted to directly report her concerns to Reaume, however, Reaume told Gale that all complaints regarding athletics must be directed to Weakley. Dkt. 77 at 8; *see* Dkt. 79-3 at 4.

ORDER - 6

On April 25, 2019, Reaume emailed Cai Hadfield, an insurance adjuster with the Washington Schools Risk Management Pool (WSRMP), informing Hadfield of the following:

> I have a report of a potential boundary invasion of a high school male coach with several female high school and junior high school athletes. I am going to need some assistance, please. I usually work with Duncan Fobes.
>
> Here is the information:
>
> Employee: Brian Weekes (been with the district for over 30 years, as a certified teacher and coach)
> Track and Field Coach
>
> Two other coaches reported the following:
>
> 1. Coach Weekes has been seen following high school girl athletes around, massaging their shoulders, thighs, etc.
> 2. He was seen in the weight room with lights [off] with one student athlete (female) – S.[] M.[], massaging her shoulders, on April 16th
> 3. On April 24th, he massaged S[]'s thighs on a bench near the track. She was on her belly and he had both hands on her behind.
>
> We are going to pull video tapes at various locations to see if we have any of these captured.

*Id.* at 78-1. Reaume forwarded the email to QVSD's counsel, Duncan Fobes, who acknowledged receipt. *Id.*

The next day, Weakley sent a "Letter of Direction" to Weekes requiring him to "[r]efrain from having any physical contact with Forks High School and Junior High School female athletes." Dkt. 43-5. Weakley also spoke with Weekes in his classroom and sent Weekes an email thanking him for the conversation and confirming QVSD's request that "[m]oving forward," Weekes refrain from having any physical contact with female athletes. Dkt. 43-6 at 1. Weekes responded to Weakley's email the next day,

complaining that this restriction "really puts a damper on my coaching." *Id.* He explained that he felt "a bit frustrated, undercut, back stabbed and falsely accused." *Id*. Over the next few days, Weakley and Weekes exchanged several emails. *Id.* at 1–2. Weakley forwarded the thread to Reaume, requesting guidance. *Id.* at 2. Weekes was not investigated any further and the investigation was closed.

Weekes later denied Gale's allegations, asserting that he never stretched a high school girl in a darkened weight room alone. Dkt. 102-3 at 3.

**C.      Larson's allegations of harassment from 2019–2023**

Larson alleges that from the time of her assault in 2019 until September 2023, Weekes continued to harass her, including with "sexual innuendo and improper personal contact." Dkt. 20-1 at 3. Larson describes several of her interactions with Weekes that she characterizes as "inappropriate," and also provides a record of their text exchanges. *Id.* Weekes disputes Larson's account of their interactions, asserting that they were all "friendly" and "entirely non-sexual in nature." Dkt. 86 at 4. Larson's primary alleged incidents of harassment are detailed below.

On November 6, 2020, Larson notified Weekes that she had been in close contact with someone who tested positive for COVID-19 and would need to self-quarantine for two weeks. Dkt. 62-13 at 1. Weekes responded that he would need to inform the school. *Id.* The following text exchange then occurred:

> **Weekes**: How you doing
> **Larson**: Like I said, I feel fine. Kinda bummed that just being in contact with someone who's got it shuts all that down though.
> **Weekes**: Yea I am waiting now to see if I have to say home. I think we have been in close contact too

> **Larson**: I hope you don't have to. I don't have any symptoms. I'm not sick. Erg. . . .
> **Weekes**: Oh well if so quarantine together
> **Larson**: Watch all those movies
> **Weekes**: Come on over I make some popcorn.
> . . .
> **Weekes**: You bringing pop or chips
> **Weekes**: My hands are cold wanna warm them for me
> **Weekes**: Wanna ride in my fancy car

*Id.* at 2. Larson did not respond to the last three texts.

In November 2021, Weekes texted Larson about scheduling her performance evaluation. Dkt. 62-15 at 1. The following exchange occurred:

> **Larson**: I can drop by sometime tomorrow or Friday just let me know what works for you."
> **Weekes**: No can do unless you wanna ride to Seattle.
> **Weekes**: Unless you want to swing by the house this morning.

*Id.* Weekes later texted, "Hike?" *Id.* The next day, the text exchange continued:

> **Weekes**: Are you coming in today?
> **Weekes**: Are u just not talking to me.
> **Larson**: No, I had the day off so I was out and about doing stuff. Sorry I missed your call!
> **Weekes**: Are you coming today. Do you not know you are supposed to be waiting always for me to contact you.
> **Larson**: when's a good time for me to come in?

*Id.* at 1–2.

Early in the 2022 cross country season, Weekes approached Larson about his intent to retire within the next few years and asked whether she "would take over the head coaching job." Dkt. 62-1 at 14. In October 2022, the cross country team went on an overnight trip to a meet. *Id.*; Dkt. 20-1 at 4. One evening, Weekes and Larson had dinner at a restaurant next to their hotel, where they sat in a window booth across from each

other. Dkt. 62-1 at 15. Larson alleges that when they were looking at the menus, "he started to touch my knees and my legs underneath the table." *Id.* Larson alleges that she "pushed him away a couple of times, but he kept . . . touching me." *Id.* at 15–16. Larson told him to stop, and "then he finally did." *Id.* at 16.

On November 3, 2022, Weekes and Larson took the team to the mall to go shopping during an away meet. *Id.* at 17. When walking into the Macy's store, Larson pointed out to Weekes a "weird" looking dress that she describes as "this really absurd velvet dress that was cut very funny." *Id.* Weekes asked her if she would try it on. *Id.* Larson replied no. *Id.* Larson alleges that he continued to bring up the dress the entire time they were at the mall. *Id.* After getting back from the mall, Weekes and Larson had the following text conversation:

> **Weekes**: I hope [you] know I am serious about not actually sleeping with you I wouldn't do that to you
> **Larson**: Yes I know!
> **Weekes**: I do give you massage and rub but that would be it
> . . .
> **Weekes**: Besides you seem to not be able to touch me so that would be a problem

Dkt. 62-16 at 1. Weekes texted Larson multiple times that night, including after midnight when he texted, "U can visit. I'll be up another 2 hours." *Id.* at 2–3

On November 10, 2022, Weekes texted a kissing emoji to the Larson. *Id.* at 10. On December 8, 2022, Weekes requested that Larson witness him secure a concessions cash box. Larson alleges that before leaving Weekes asked for a hug and while hugging her, he kissed her forehead. Dkt. 20-1 at 5; Dkt. 62-1 at 20–21. In January 2023, Weekes

ORDER - 10

again asked Larson to secure a cashbox. Larson alleges that as she was leaving, he gave her a hug goodbye and grabbed her butt. Dkt 20-1 at 5; Dkt. 62-1 at 22.

On May 1, 2023, Weekes texted, "When is taco Tuesday?" Larson did not respond. Dkt. 62-17 at 2. The next day, Weekes texted, "[A]nd I thought you still loved me." On May 17, 2023, Weekes texted at 2:02 a.m., "Good morning." *Id.* at 4. Less than an hour later, he texted, "Oops." *Id.* Later that morning, Weekes texted, "Did u get my wake up call[?]" *Id.* Larson did not respond.

On May 22, 2023, Weekes texted Larson multiple times with no response, including the following:

> **Weekes**: Call after practice if you can talk for a bit
> **Weekes**: Nevermind
> **Weekes**: Take me off ignore

*Id.* at 5. The next day Larson responded, "Ah shoot sorry, saw your text when I got to work, my phone has been glitching out. Do you need something?" *Id.* Weekes replied, "Look at all of them I was bored driving yesterday and today." *Id.*

At some point in May 2023, Coach Gale was substitute teaching at the high school when Weekes pulled her out of the classroom to tell her that he was worried Larson is drinking too much, partying too much, wants to have a child, and is afraid someone is going to take advantage of her. Dkt. 62-4 at 4. Weekes also told Gale that he had recently been to the doctor and that he is going to be live to be a hundred. *Id.* After the conversation ended, Gale told Poole about what Weekes had told her, but did not immediately tell Larson. *Id.*

Poole told Larson about Gale's conversation with Weekes. *Id.* at 5. During the state track meet over Memorial Day weekend, Larson asked Gale about it. As Gale began to explain, Larson started crying and told Gale about her alleged encounter with Weekes in his hotel room at the Nike conference. *Id.*

On June 13, 2023, Weekes texted Larson, asking about her plans for the following cross country season:

> **Weekes**: Ok so u arent talking to me but I need to know if u want to be involved if so I will continue in that thought if not I will find someone else

Dkt. 62-17 at 6. The next day the text exchange continued:

> **Weekes**: Ok I guess someone else it is.
> **Weekes**: Can I come to talk to you
> **Larson**: No, I just finished track and I need a break. I'll let you know when I'm ready to think about [cross country].
> **Weekes**: Ok but it's pretty much set and done. Just working with the kids for fund raisers hope I didn't do something to make you mad. I'll stop looking for someone else and leave you alone just check Facebook and athletic.net for info

*Id.*

Larson testified that, by the time of these texts, she was in the process of figuring out how to file a formal sexual harassment complaint with QVSD. Dkt. 62-1 at 26. She further testified that she had already made the decision that she could not coach with Weekes but had not yet decided whether she would be coaching cross country in the fall. *Id.* at 24–25.

At approximately 5 a.m. on July 3, 2023, Weekes texted "hi how u doing," followed by a series of sunrise pictures. Dkt. 62-17 at 6–8. On the morning of August 4,

2023, Weekes came to Larson's work at the Forks Visitor's Center. He sent a series of text messages:

> **Weekes**: Talk? Can we
> **Weekes**: I'm outside if u didn't see
> **Weekes**: I'll wait a minute or two
> **Weekes**: Ok then what do you want me to tell [Weakley] are u coaching or not
> **Weekes**: I won't try again

*Id.* at 8. Later that afternoon, he texted again, "Please come over and talk to me." *Id.* Larson responded, "Do not contact me." *Id.* Weekes did not text her again. Larson alleges that after this interaction Weekes removed her name as the assistant coach from the athletic.net website. Dkt. 20-1 at 7; Dkt. 61 at 16.

**D.      Progression of Larson's harassment claims**

On August 16, 2023, Larson emailed Weakley, notifying him of Weekes' alleged "sexual harassment, including sexual assault . . . [and] recent stalking." Dkt. 106-2 at 5. In response, QVSD placed Weekes on administrative leave, referred the complaint to the local Sheriff's Office, and retained a third party investigator, Rick Kaiser, to investigate the allegations. Dkt. 100 at 5. Larson did not participate with the Sheriff's Office investigation and it was closed. Dkt. 106-2 at 5. Larson also did not participate in Kaiser's investigation. *Id.* at 3. According to QVSD, "Larson refused to cooperate with this investigation." *Id.* at 1. Larson asserts that she was willing to participate, but that QVSD's counsel, Fobes, canceled her interview after her own counsel requested certain protective measures, including a time limit and advanced notice of the questions. Dkt. 80 at 8. Kaiser's final report to the District stated that other than Larson's initial email

notifying the District that she could not coach with Weekes due to his sexual harassment, "Larson did not provide any more details or witnesses to corroborate her allegations." Dkt. 106-2 at 3. Reaume testified that because Kaiser was unable to make any findings, the District permitted Weekes to return to work as a teacher, but not as a coach. Dkt. 72 at 3; Dkt. 88 at 3.

On December 13, 2023, Larson filed a Title IX grievance with QVSD, providing further details about Weekes' alleged misconduct. Dkt. 106-3 at 3. QVSD again placed Weekes on paid administrative leave and hired Kaiser to investigate. *Id.* at 6. Larson did not participate in the investigation and Kaiser was unable to obtain evidence to corroborate or contradict her complaint. *Id.* at 3. As of the date of this Order, Weekes is still on administrative leave pending the investigation. Dkt. 72 at 3–4.

On March 15, 2024, Larson filed a formal charge with the Equal Employment Opportunity Commission ("EEOC"). Dkt. 61 at 20. On August 29, 2024, Larson sued QVSD and Weekes for claims of sexual discrimination and retaliation. Dkt. 1. On February 24, 2025, Larson amended her complaint, adding Weakley as a defendant, and adding new claims for hostile work environment and negligent retention and supervision. Dkt. 20-1 at 8–11.

The District's Answer asserted ten affirmative defenses:

1. Plaintiff's Complaint fails to state any claim upon which relief may be granted against the District.
2. Some or all of Plaintiff's claims are barred by the statute of limitations.
3. Damages, if any, sustained by Plaintiff were proximately caused by persons other than the Defendants and for whom Defendant Quillayute Valley School District has no responsibility, either direct or vicarious.

ORDER - 14

4. Plaintiff's alleged injuries and damages, if any, may have been proximately caused by independent intervening and superseding acts or omissions done by persons or parties other than Defendants.

5. Plaintiff failed to mitigate her damages, if any.

6. Plaintiff's damages may have been proximately caused by her own contributory fault.

7. Plaintiff's alleged damages, if any, may have been whole or in part caused by pre-existing conditions or events unrelated to the claims alleged against Defendants.

8. Under the laws of the State of Washington, Plaintiff's alleged injuries and damages, if any, must be segregated from those caused by the intentional and/or criminal misconduct of others, including Brian Weekes.

9. Defendant Brian Weekes's wrongful actions, as alleged by the Plaintiff, were outside of the course and scope of his employment.

10. Defendants exercised reasonable care to avoid harassment and to eliminate it when it might occur, and the Plaintiff failed to act with like reasonable care to take advantage of the District's safeguards and otherwise to prevent harm that could have been avoided.

Dkt. 24 at 5.

Larson served interrogatories on the District requesting factual support for its affirmative defenses. *See* Dkt. 43-1 at 17. The District objected, and Larson asked the District to provide factual support or withdraw them. Dkt. 43-9 at 1. The District withdrew affirmative defense one (failure to state a claim) and four (intervening and superseding acts or omissions), but asserted that it would not withdraw it statute of limitations defense. Dkt. 43-11; *see* Dkt. 127 (amended Answer)[4].

Larson now moves to dismiss the District's affirmative defenses and seeks partial summary judgment on her Title VII hostile work environment claim. Dkt. 61. Weekes seeks partial summary judgment on Larson's Title VII claims and the WLAD retaliation

---

[4] Because the parties' motions and responses were filed before the District filed its amended Answer on December 31, 2025, the Court refers to the affirmative defenses numbered in the District's first amended Answer filed March 17, 2025, Dkt. 24.

ORDER - 15

claim. Dkt. 83. The District moves for summary judgment on all of Larson's claims against it. Dkt. 86. It also moves to strike evidence that it argues is irrelevant or inadmissible, including reports of Weekes' inappropriate conduct with students, reports of boundary invasions involving other QVSD teachers and students, and student declarations describing their personal interactions with Weekes. Dkt. 70 at 10–11.

The issues are addressed in turn.

## II.   DISCUSSION

### A.   Summary judgment standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248.

On cross-motions, the defendant bears the burden of showing that there is no evidence which supports an element essential of the plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Conversely, the plaintiff "must prove each essential element by undisputed facts." *McNertney v. Marshall*, No. C-91-2605-DLJ, 1994 WL 118276, at *2 (N.D. Cal. Mar. 4, 1994) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190,

1194 (5th Cir.1986)). Either party may defeat summary judgment by showing there is a genuine issue of material fact for trial. *Id.*; *Anderson*, 477 U.S. at 250. Although the parties may assert that there are no contested factual issues, this is ultimately the Court's responsibility to determine. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

**B.      There are sufficient facts to support the District's affirmative defenses.**

Larson moves to dismiss the District's affirmative defenses, including its statute of limitations defense, for failure to provide evidence supporting those defenses throughout discovery. Dkt. 61 at 19; Dkt. 80 at 2. She argues that its defenses are not true affirmative defenses; rather, they "merely negat[e]" elements of her claims. *Id.* Larson also contends that the District's statute of limitations defense must be dismissed because each of her claims is timely. Dkt. 80 at 6.

The District contends that Larson's motion is procedurally improper. It argues that, to the extent Larson seeks to strike them as insufficiently pleaded, the motion is untimely under Federal Rule of Civil Procedure 12. Dkt. 70 at 22. Alternatively, the District asserts that if the motion is construed as one for summary judgment on its affirmative defenses, it must be denied because genuine issues of material fact preclude such relief. *Id.*

The Court agrees that Larson's motion applies the wrong standard on summary judgment. Larson argues that she did not receive "fair notice" of the District's affirmative defenses. However, fair notice is the Rule 12(f) motion to strike legal standard. *See* Dkt. 61 at 19. She also contends that the District failed to plead specific facts in its Answer

supporting its affirmative defenses and asserted several defenses that do not qualify as true affirmative defenses. *Id.*

To the extent Larson moves to strike the defenses as insufficient, the motion is untimely and unavailing. Rule 12(f) permits a party to move to strike an affirmative defense within 21 days after being served with the pleading. The key to determining the sufficiency of an affirmative defense is whether it gives a plaintiff fair notice of the defense. *Wyshak v. City Nat. Bank*, 607 F.2d 824, 827 (9th Cir. 1979); *see, e.g. Hennessey v. Radius Glob. Sols. LLC*, No. 3:24-CV-05654-DGE, 2024 WL 4696134, at *2 (W.D. Wash. Nov. 6, 2024) ("'Detailed factual allegations are not required—simply '[p]leading enough factual content to identify the factual grounds on which an affirmative defense rests is adequate to provide fair notice' of the affirmative defenses to Plaintiff and the Court.'" (quoting *White v. Univ. of Washington*, No. 2:22-CV-01798-TL, 2023 WL 3582395, at *7 (W.D. Wash. May 22, 2023)).

Larson filed this motion seven months after being served with the Answer—well beyond the time permitted for such motions. Any argument about whether an affirmative defense qualified as an affirmative defense or whether it failed to provide fair notice should have been filed as a Rule 12(f) motion long ago. Moreover, Larson obviously had fair notice, because she specifically references and disputes the affirmative defenses in her motion for summary judgment. A Rule 12(f) motion to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject of the litigation. *Neveu v. City of Fresno*, 390 F. Supp. 2d 159, 1170 (E.D. Cal. 2005).

ORDER - 18

Larson's motion is properly evaluated as one for summary judgment. Larson argues broadly that the District provided no factual support or documents supporting its defenses in discovery. Dkt. 61 at 19. The District counters that the factual record supports all its defenses, including that Larson failed to mitigate her damages, that her damages were proximately caused through her own fault, and that she failed to take advantage of the District's anti-harassment procedures. Dkt. 70 at 23.

A true affirmative defense has two primary characteristics: the party asserting it carries the burden of proof, and Rule 12 requires a defendant to assert an affirmative defense in its Answer, or it is waived. Affirmative defenses offer legal reasons why, accepting the claims as true, the defendant is not liable. *In re Wash. Mut., Inc., Secs., Derivative & ERISA Litig.*, No. 08–md–1919MJP, 2011 WL 1158387, at *1 (W.D. Wash. 2011). A defense that the plaintiff has failed to state a claim, or cannot prove the elements of her claim, is not an affirmative defense; it is just a defense. Listing it in one's answer does not make it an affirmative defense or shift the burden of proof to the defendant.

Viewed in the light most favorable to the District, the Court concludes that all but one of the District's affirmative defenses are supported by sufficient evidence. Affirmative defenses five through seven generally contend that Larson's alleged damages were caused, in whole or in part, by factors independent of its conduct, including Larson's failure to mitigate her damages, Larson's own contributory fault, and preexisting conditions or unrelated events. Dkt. 24 at 5. The District's defenses three and eight contend that that the District bears no direct or vicarious liability for Weekes' conduct, and any injuries attributable to intentional or criminal acts must be segregated

from those damages. *Id.* at 5–6. The District's defense ten invokes the *Faragher-Ellerth*[5] affirmative defense, asserting that it exercised reasonable care to prevent and correct harassment and that Larson failed to take advantage of the District's policies and preventative safeguards. *Id.* Each of these defenses is supported by evidence and argument, including that Larson was trained on the District's anti-harassment policies and that the District exercised reasonably care in following its policies upon receipt of Larson's report of harassment. *See* Dkt. 88.

However, the District provides no factual support for defense nine, which asserts that "Weekes's wrongful actions, as alleged by [Larson], were outside of the course and scope of his employment." Dkt. 24 at 6. Larson argues that the District provided no evidence for this defense and later "abandoned" it by contending, in its response to her motion, that Weekes' conduct does not constitute sexual harassment.[6] Dkt. 80 at 6–7, n. 6.

The Court agrees that the District abandoned this defense, but for a different reason: the District did not present any argument or make any reference to the course and scope of employment in any motion or response related to summary judgment. Larson's

---

[5] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

[6] It is not clear why the District asserted this defense, or why Larson seeks summary judgment on it. "Outside the scope of employment" is a defense when the plaintiff seeks to make an employer vicariously liable for its employee's negligence. That is not this case. Instead, Larson seeks to make the District liable for its own negligence in hiring, retaining, and supervising Weekes. "Outside the scope" is an element of the plaintiff's claim, not a defense to it. To prevail on a Washington claim of negligent supervision, a plaintiff must show that "an employee of the defendant acted outside the scope of their employment." *McDaniels v. Group Health Co-op.*, 57 F. Supp. 3d 1300, 1317 (W.D. Wash. 2014)).

motion for summary judgment on this defense is therefore **GRANTED**, and it is **DISMISSED**.

More directly at issue are the parties' cross-motions for summary judgment on the District's statute of limitations affirmative defense. Larson moves to dismiss this defense, asserting that her Title VII claim is timely. Dkt. 61 at 17. She contends that Weekes' actions constitute a continuing course of abuse from January 2019 until September 2023, including during the summer of 2023 when Weekes continued to text her, visited her place of employment, and removed her name from the athletic.net website. Dkt. 112 at 16–17; Dkt. 61 at 20.

The District seeks summary judgment on Larson's Title VII claim, arguing that it is time-barred. Dkt. 86 at 12. It contends that Larson identifies no qualifying harassment conduct by Weekes within 300 days of her March 15, 2024 formal charge with the EEOC. *Id.*

An employee wishing to bring a civil action for hostile work environment must file an administrative charge with the EEOC within 300 days of any single act contributing to the hostile work environment. 42 U.S.C. § 2000e-5(e)(1). A hostile work environment is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1). The unlawful employment practice therefore cannot be said to occur an any single day, but instead, it "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). For a hostile work environment claim to therefore be timely,

the employee need only file a charge within 300 days of any act that is part of the hostile work environment. *Id.* (Consideration of an entire scope of a hostile work environment claim is "permissible for the purposes of assessing liability, so long as an act contributing to that hostile work environment claim takes place within the statutory time period.").

To determine whether an individual act is part of the same actionable hostile work environment practice, a court must consider "'the social context in which the conduct occurred.'" *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). This inquiry requires examination of the "surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Id.* "[W]hat might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender." *Id.*

To survive summary judgment, Larson is required to demonstrate only that genuine issues of material fact exist as to whether the acts about which she complained were "'part of the same actionable hostile work environment practice, and if so, whether any act [fell] within the statutory time period.'" *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002) (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 103).

Larson filed her EEOC charge March 15, 2024. Dkt. 61 at 20. For Larson's Title VII hostile work environment claim to be timely, at least one act contributing to the hostile work environment must have occurred on or after May 20, 2023. The District

argues that Weekes "benign and gender neutral actions" between May and September 2023 are not sufficiently charged to extend the time period to file a discrimination claim. Dkt. 86 at 13. It asserts that the later acts must be of the "same type and natures as the previous acts," or else the standard would essentially create a "last contact of any kind" limitation. *Id.* Larson responds that "there is virtually no difference between the type of conduct [Weekes] subjected [Larson] to after May 2023 as compared to the conduct that occurred prior. It was all related to the initial assault in January 2019 and . . . Weekes' continued harassment over the years." Dkt. 112 at 17.

The Court concludes that although Larson and Weekes had minimal interaction during the summer of 2023, Larson's allegations of continued unwanted text messages and workplace "stalking" are sufficient to raise a genuine issue of fact as to whether the hostile work environment continued into the relevant limitations period.

On May 22, 2023, Weekes sent Larson multiple text messages without receiving any response, commenting later that he was bored while driving. Dkt. 62-17 at 5. On June 14, 2023, Larson texted Weekes that she "need[ed] a break" and would "let [him] know when [she was] ready to think about [cross country.] Dkt. 62-17 at 6. In July, Weekes texted her again, sending multiple sunrise pictures. *Id.* at 8. In August, Weekes twice visited her place of employment and requested she come outside to talk. *Id.* at 8. Larson also alleges that Weekes removed her name as the assistant coach from the website during that same time period with no explanation. Dkt. 61 at 20.

Viewed in isolation, Weekes' behavior towards Larson during the summer of 2023 may not appear to contribute to a pattern of discriminatory harassment. However, on

summary judgment, the Court draws all inferences in the light most favorable to Larson. When viewed in context, considering Weekes' and Larson's prior interactions and relationship, the Court finds that there is a genuine dispute of material fact as to whether a continuing violation occurred during the relevant period.

The District's summary judgment motion on Larson's Title VII claim on the ground that it is time-barred is **DENIED**.

Larson's summary judgment motion on the District's affirmative defense nine, that Weekes acted outside the course and scope of his employment, is **GRANTED**.

Larson's summary judgment motion on all remaining affirmative defenses, including the District's statute of limitations defense, is **DENIED**.

**C.    Larson's Title VII hostile work environment claim cannot be resolved as a matter of law.**

The District and Larson seek summary judgment on Larson's Title VII hostile work environment claim. Larson argues that there are no genuine issues of material fact that Weekes subjected her to unwelcome verbal and physical harassment because of her sex and that Weekes' conduct was sufficiently severe to create an abusive work environment. Dkt. 61 at 22.

The District counters that there are contested facts as to every element of Larson's claim. Dkt. 70 at 14. It argues that Weekes' interactions with Larson were all "friendly and non-sexual in nature." *Id*. It asserts that Larson willingly spent time with Weekes and often "reciprocated" by responding to his text messages and requesting massages and hugs. *Id.* at 15. It contends that Larson's alleged "handful of physical incidents"

occurring over the span of many years was not sufficiently severe and pervasive to support a claim of hostile work environment, especially because they made no impact on Larson's job performance or responsibilities. *Id.* at 16–17.

However, even if Larson was subject to a hostile work environment, the District argues that it is not liable as a matter of law. The District asserts that Weekes was Larson's coworker, not her supervisor, and that it is not liable for actions that it neither knew about nor had reason to know about. Dkt. 86 at 16. Moreover, the District contends that it is entitled to judgment as a matter of law on its *Faragher-Ellerth* affirmative defense, because it exercised reasonable care to prevent and promptly correct any sexually harassing behavior. Dkt. 86 at 17. It also asserts that Larson unreasonably failed to take advantage of the District's anti-harassment policies, which were implemented to prevent and correct harassment. *Id.*

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e–2(a)(1). A hostile work environment is a form of sex discrimination. *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 871 (9th Cir. 2001). A "hostile work environment" occurs "when there is a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper*, 147 F.3d at 1108. To establish a prima facie claim, Larson must show that (1) she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment

and create an abusive working environment. *Ellison v. Brady*, 924 F.2d 872, 875–76 (9th Cir. 1991). The working environment must both subjectively and objectively be perceived as abusive; that is, Larson must show that "she perceived her work environment to be hostile, and that a reasonable person in her position would perceive it to be so." *Dominguez–Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1034 (9th Cir. 2005).

Viewing the evidence in the light most favorable to the District, the Court agrees that there are factual disputes as to every element. A reasonable jury could find that Weekes' text messages, including his text message asking if Larson needed help in the shower, was sexual in nature. Larson testified that Weekes' physical touch was unwelcome, and that she repeatedly asked him to stop. Moreover, a reasonable jury could find that a 19-year-old woman in her position as assistant coach could perceive that head coach Weekes' texts and unwanted touching were not just "offhand comments or jokes," but rather contributed to a severe and pervasive hostile workplace. Dkt. 70 at 16. Because a jury will have to determine which version of the facts is the truth, summary judgment is not appropriate.

Larson's summary judgment motion on her Title VII hostile work environment claim is **DENIED**.

Even where an employee is subjected to a hostile work environment, an employee must still show that the employer is liable for the conduct that created the environment. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002). An employer's liability is evaluated differently when the harasser is a supervisor, as opposed to a

coworker. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004). If the harassing employee is a supervisor and a "tangible employment action" occurs, then the employer is strictly liable. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). But if no tangible employment action is taken, the employer may escape liability by establishing as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id.* (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765). In contrast, if the harassing employee is a co-worker, the employer is liable only if it was negligent in controlling working conditions. *Id.* The question of whether an employee qualifies as a supervisor can "very often" be resolved as a matter of law. *Id.*

An employee is a supervisor under Title VII if they are "a person who can take tangible employment actions against the plaintiff." *Id.* at 440. A tangible employment action includes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429. Merely exercising significant direction over another employee's daily work is not sufficient. *Id.* at 439. Rather, a supervisor has the power to cause "direct economic harm" by taking a tangible employment action. *Id.* at 440.

However, an employer may not isolate itself from heightened liability by confining formal decision-making power to a small number of individuals who solely rely on other workers' input. *Id.* at 447. In those circumstances, the employer "may be

held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id.* (citing *Ellerth*, 524 U.S., at 762).

Larson contends that Weekes was her supervisor. Dkt. 61 at 26. She asserts that their titles—head coach and assistant coach—necessarily and correctly imply that she was Weekes' subordinate. *Id.* She further contends that Weekes alone was responsible for conducting her performance evaluations, and that the District's superintendent testified that "supervis[ing] the assistant coaches" is the head coach's responsibility. Dkt. 61 at 26.

The District argues that Weekes was not Larson's supervisor as a matter of law because he had no authority to hire or fire her, reassign her job responsibilities, or make any decision that would affect Larson's employment. Dkt. 86 at 16. It asserts that although Weekes was responsible for conducting Larson's performance evaluations, he had no authority to recommend[7] or ensure that she was terminated based on a poor evaluation. *Id.*

Although Weekes did not have formal authority to hire, fire, or discipline Larson, there are genuine issues of material fact as to his supervisory status. Weekes sat on the District's hiring selection committee that decided to hire Larson and his opinion in hiring the assistant coach was given "serious consideration." Dkt. 62-18 at 2. In addition, as head coach, Weekes was the only person responsible for conducting Larson's performance evaluations. *See* Dkt. 62-18 at 2. Neither Reaume or Weakley attended those evaluations, and a negative performance evaluation could likely impact her future

---

[7] It is undisputed that Weekes recommended that the District hire Larson.

ORDER - 28

employment. *Contrast Vance*, 570 U.S. at 447 (concluding that when an employer relies on an individual's recommendation, it may have effectively delegated the power to take tangible employment actions); *and Kim v. Coach, Inc.*, 692 F. App'x 478, 479 (9th Cir. 2017) (holding that an allegedly harassing employee was not a supervisor where they only attended the plaintiff's performance evaluations and the individual with authority to take employment actions personally evaluated the plaintiff's work performance).

The Court is unpersuaded by Reaume's testimony that Weekes lacked power to even recommend that an assistant coach be terminated or disciplined based on a negative evaluation.[8] Dkt. 62-18 at 2; Dkt 88 at 2. As Reaume herself made clear, a head coach's opinion is given serious consideration in employment decisions. *See* Dkt. 62-18 at 2. Indeed, Weekes claimed he had to visit and wait for Larson at her other job prior to the start of the 2023 cross country season, because he "needed to know if she was going to coach cross country or not." Dkt. 71-1. Within a short time, Larson's name was removed as assistant coach from athletic.net and Weekes was one of two individuals with the knowledge and authority to take that action. A jury could find that his repeated inquiries about the status of her employment and the subsequent removal of her name as coach from athletic.net suggest that he had the supervisory authority to take a tangible

---

[8] Larson asks that the Court strike Reaume's "self-serving declaration" for bad faith. Dkt. 80 at 7–8. Larson is presumably arguing that Reaume's declaration, asserting that Weekes did not have the authority to hire, fire, or change the job responsibilities of the assistant coach, Dkt. 72 at 2, conflicts with her deposition testimony that it was Weekes' responsibility to supervise Larson, Dkt 62-18 at 2. There is no conflict in these statements. Larson's motion to strike is **DENIED**.

employment action against her. These facts undermine the claim that he was simply a co-worker.

Weekes also exercised significant supervisory control over Larson's day-to-day activities and responsibilities. *Cf. Vance*, 570 U.S. at 449 (granting summary judgment where the defendant did *not* assign petitioner's daily tasks.). While job titles alone are insufficient to prove that an employee is a supervisor, Weekes' title as head coach, and Larson's title as his assistant, strongly implies that he exercised supervisory authority over her, and a jury could make this inference. This is further supported by Reaume's testimony that Weekes was responsible for "supervis[ing]" Larson as the head coach. *See* Dkt. 61 at 26. Where, as here, "evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotations marks omitted).

Nevertheless, the Court concludes as a matter of law that Larson has failed to establish that Weekes subjected her to a tangible employment action sufficient to impose strict liability on the District. *See Vance*, 570 U.S. at 424 ("If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."). Larson argues that Weekes took multiple tangible employment actions against her, including by "informing [her] that she would have to take over stretching and massaging of female student athletes," and "threatening her that if she did not respond to his sexual advances over text, then she was not performing the duties of her job." Dkt. 61 at 26. She also characterizes Weekes conduct as "material adverse employment actions," citing a "near-

daily barrage of text message and emails," and "putting up" with Weekes harassment and "pressure[] not to report the allegations." Dkt. 118 at 18.

These arguments conflate the broader concept of an "adverse employment action" necessary to prove a retaliation claim with the narrower "tangible employment action" needed to prove an employee's supervisory status for purposes of a hostile work environment claim. A tangible employment action requires more than merely directing another employee's work; it must involve a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S.at 429. Moreover, Larson fails to produce evidence substantiating Weekes' alleged threats.[9] Because Larson fails to show that she experienced a qualifying tangible employment event, she is not entitled to strict liability on her hostile work environment claim.

However, there are genuine issues of material fact as to whether the District may still be liable. Where an employee is a supervisor, but no tangible employment action is taken, the employer may escape liability by establishing the *Faragher-Ellerth* affirmative defense. Under this standard, the employer must show that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Id.* at 424 (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at

---

[9] Larson's allegations of overt threats are in her briefing, but she has not provided any evidence, such as declarations, depositions, text messages, supporting them.

ORDER - 31

765). The District argues that it is entitled to *Faragher-Ellerth* defense as a matter of law. Dkt. 86 at 17. However, questions of fact remain as to whether it can satisfy both prongs.

Viewed in the light most favorable to Larson, the evidence shows the District did not take reasonable care to prevent sexual harassment when it failed to properly investigate and monitor Weekes for sexual harassment after it received reports of Weekes inappropriately touching students. A jury could find that Larson did not unreasonably delay reporting. She emailed the school district less than two weeks after Weekes unexpectedly showed up at her place of employment and less than three months after she received a series of text messages, including, "Did u get my wake up call[?]" and "Take me off ignore." Dkt. 62-17 at 4, 5. Moreover, a jury could find that a reasonable woman of Larson's age and position may hesitate to report the actions of her "supervisor," who exercises control over her employment. The Court concludes that there are triable issues of fact as to whether the District had notice of Weekes behavior and could have reasonably prevented further harm.

The District's summary judgment motion on Larson's Title VII hostile work environment claim is **DENIED**.

**D.    Larson's WLAD hostile work environment claim cannot be resolved as a matter of law.**

The District also seeks summary judgment on Larson's WLAD hostile work environment claim, asserting that for the same reasons it is not liable under Title VII, it is not liable under WLAD. Dkt. 86 at 15. It contends that Weekes' actions cannot be

ORDER - 32

"imputed to the District," because he was not Larson's "manager" and because the District had no notice of Weekes' alleged inappropriate conduct against Larson. *Id*.

Although Larson does not move for summary judgment on this claim, she nonetheless argues that there is no dispute that the District is vicariously liable. Dkt. 112 at 19. She reiterates that the District knew of Weekes' conduct toward student female athletes and failed to reasonably investigate and prevent further harm. *Id.*

The elements of a state law WLAD hostile work environment claim are the same as those for a federal Title VII hostile work environment claim. *Washington v. Horning Bros*., LLC, 339 F. Supp. 3d 1106, 1126 (E.D. Wash. 2018) (citing *Antonius v. King Cnty*., 153 Wn.2d 256, 261 (2004). To prove a prima facie claim, an employee must show "(1) [t]he harassment was unwelcome, (2) the harassment was because of sex, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer." *Glasgow v. Georgia-Pac. Corp*., 103 Wn.2d 401, 406-07 (1985). Harassment under WLAD will be imputed to the employer in one of two ways: (1) when an "owner, partner, corporate officer, or manager" personally participates in the harassment, or (2) when the "plaintiff's supervisor or co-worker . . . authorized, knew, or should have known of the harassment and … failed to take reasonably prompt and adequate corrective action." *Id.* at 407.

A "manager" for purposes of WLAD is a person "who ha[s] been given by the employer the authority and power to affect the hours, wages, and working conditions of the employer's workers." *Robel v. Roundup Corp*., 148 Wn.2d 35, 48 n.5 (2002). If an employee is a manager, the employer may still escape liability by establishing the

*Faragher-Ellerth* affirmative defense. *Elward v. Sealy Inc.*, No. 23-4143, 2025 WL 1189502, at *1 (9th Cir. Apr. 24, 2025).

The District argues that Weekes was not Larson's manager under WLAD as a matter of law. Dkt. 86 at 19. It contends that Weekes was a part-time coach with no authority to make employment decisions. It further asserts that the District had no knowledge of Weekes' alleged harassment against Larson and took immediate corrective action when she finally reported it. *Id.*

Larson does not dispute that Weekes was not her manager; instead, she asserts that Weekes was her "supervisor" and applies the corresponding standard, arguing that the District knew of his inappropriate conduct with female student athletes and failed to take reasonably prompt and corrective action. Dkt. 112 at 19.

Viewing the evidence in the light most favorable to Larson, a reasonable jury could find that Weekes subjected Larson to a hostile work environment and that his conduct is imputed to the District. Reaume's April 2019 email, sent to WSRMP and the District's counsel, establishes that the District had knowledge of Weekes' inappropriate conduct with female athletes. Upon notice of the report, the District did not speak with parents and students, did not document the investigation, and did not supervise Weekes after the investigation was closed. Because a reasonable jury could find that the District had knowledge of Weekes' misconduct and failed to take prompt and corrective remedial action, the question of the District's liability for Larson's WLAD hostile work environment claim cannot be resolved as a matter of law.

ORDER - 34

The District's summary judgment motion on Larson's WLAD hostile work environment claim is **DENIED**.

**E.     Larson's Title VII and WLAD retaliation claims cannot be resolved as a matter of law.**

The District moves for summary judgment on Larson's Title VII retaliation claim, arguing that Larson cannot establish any retaliatory action by the District. Dkt. 86. It argues that because Weekes was only Larson's coworker, not her supervisor, the District is not liable for retaliation. Dkt. 118 at 12.

Title VII prohibits an "employer" from discriminating against an employee because that employee "has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e–3(a). The term "employer" is not limited to the employing entity alone. The District acknowledges, that a *supervisor's* actions may constitute retaliation by the employer. Dkt. 118 at 13 (citing *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000)). The District also cites to multiple district court cases analyzing Title VII retaliation claims against employers for a supervisor's retaliatory acts.

In *Ray*, a postal worker complained of management's treatment of its female employees. *Id.* at 1240. After learning of the complaint, the worker's supervisors targeted him with verbal abuse and made it harder for him to complete his own work. *Id.* at 1245. Ray sued the postmaster general for retaliation. The district court dismissed, but the Ninth Circuit reversed, concluding that based on this evidence, a genuine issue of fact existed as to whether the worker's supervisors subjected him to a hostile work environment in retaliation for his complaint.

The Court concludes that whether Weekes was Larson's supervisor for purposes her retaliation claim presents a triable issue of fact. QVSD superintendent Diana Reaume testified that as the head coach, Weekes was responsible "to supervise" the assistant coaches. Dkt. 62-18 at 2. While he was not solely responsible for employment decisions, Weekes was a member of the committee that hired Larson and his opinion is given "serious consideration" in employment decisions. *See* Dkt. 62-18 at 2. Weekes alone was responsible for conducting Larson's performance evaluations and exercised supervisory control over her work schedule and activities. *Id.* He also had control to remove her name as assistant coach from athletic.net and it was Weekes, not Reaume or Weakley, who repeatedly asked her if she intended to continue coaching. Viewed in the light most favorable to Larson, the evidence supports the conclusion that Weekes was Larson's supervisor, and the District may be held liable for his retaliatory actions.

Weekes makes a similar argument in seeking summary judgment on Larson's WLAD retaliation claim. He argues that because he is Larson's coworker, he cannot be held liable under WLAD. Dkt. 117 at 2.

WLAD prohibits "employers . . . *or other persons*" from retaliating against employees who oppose discriminatory practices. RCW 49.60.210(1) (emphasis added). Weekes argues that the term "other person" does not include a coworker. For support, he relies on *Malo v. Alaska Trawl Fisheries, Inc.*, 92 Wn. App. 927 (1998).

In *Malo*, the plaintiff was the co-captain of a fishing boat. He brought a WLAD retaliatory discharge claim against his co-captain. The trial court dismissed the claim because the defendant was not the plaintiff's employer. The Court of Appeals affirmed,

holding that WLAD does not create liability for co-workers' actions. It explained that the statutory term "other person" is directed at entities "functionally similar to employers." *Id.* at 930. Because the defendant "did not employ, manage or supervise" the plaintiff, the court concluded that the defendant could not be liable for retaliation. *Id.* at 930–31. The Washington Supreme Court later confirmed that courts should employ *Malo*'s "functionally similar" test to determine whether an individual defendant exercised "sufficient control over the plaintiff's employment to be held personally liable for discriminatory actions." *Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171*, 189 Wn.2d 607, 617 (2017).

Unlike the defendant co-captain in *Malo*, there is ample evidence that Weekes was responsible for supervising, managing, and evaluating Larson. This is sufficient to establish that Weekes was "functionally similar" to an employer for purposes of Larson's WLAD retaliation claim.

Weekes and the District also argue that Larson failed to provide sufficient evidence to establish the prima facie elements necessary to prove her retaliation claims. They assert that her refusal of Weekes' sexual advances is not a statutorily protected activity, that she did not suffer an adverse employment action, and that Weekes' alleged harassment was done in retaliation for resisting him. Dkt. 86 at 2; Dkt. 117 at 2; Dkt. 118 at 12–14.

Larson contends that Weekes subjected her to multiple adverse employment actions in retaliation for her opposition to his sexual advances. Dkt. 110 at 13–15; Dkt. 112 at 21–22. She further contends that once she told Weekes that she wasn't ready to

talk about cross-country, Weekes responded by removing her name from athletic.net and visiting her at her other place of employment. Dkt. 110 at 16.

Title VII and WLAD retaliation claims are analyzed using the three-step *McDonnell Douglas* burden shifting framework. *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 415-21 (2018); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) (applying same standard under WLAD and Title VII). This case involves the first step—the plaintiff's burden to establish a prima face case of retaliation. To meet this burden, Larson must show that she (1) engaged in or was engaging in a statutorily protected action, (2) suffered an adverse employment action, and (3) that there was a causal link between the protected activity and the adverse employment action. *Id*. at 234.

Weekes argues that Larson fails to show that she engaged in a statutorily protected activity. He asserts that "refusal of sexual advances from a coworker is not a protected action under WLAD." Dkt. 117 at 4. He argues that Larson spoke only to him about her objections and that statements to a co-worker do not qualify as protected opposition activity. *Id.* Larson counters that she engaged in protected activity every time she pushed back against Weekes' sexual advances. Dkt. 110 at 13.

An employee engages in a statutorily protected activity when they oppose "any practices forbidden by" the Act. RCW 49.60.210(1); *see* § 2000e–3(a). The word "oppose" in this context carries the ordinary meaning, including "'to offer resistance to, contend against, or forcefully withstand.'" *Lodis v. Corbis Holdings, Inc*., 172 Wn. App. 835, 848 (2013) (quoting Webster's Third New International Dictionary 1583 (2002); *see also Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn*., 555 U.S. 271, 276

(2009) (defining the word oppose in Title VII to mean "resist or antagonize . . . ; to contend against; to confront; resist; withstand (quoting Webster's New International Dictionary 1710 (2d ed.1957)). WLAD is construed liberally. RCW 49.60.020.

Viewed in the light most favorable to Larson, the evidence demonstrates that Larson opposed Weekes' discriminatory conduct by "pushing away" his sexual assault in January 2019 and telling him that she would never think of him that way. Dkt. 62-1 at 8. She also opposed his discriminatory conduct when she pushed away his hands from touching her legs while sitting at a restaurant and ignored Weekes' text messages that contained sexual innuendo. The Court concludes that viewed in the light most favorable to her, the evidence establishes the first element of Larson's retaliation claim.

Next, the District and Weekes argue that Larson cannot show that she suffered an adverse employment action. They argue that removal of her name from athletic.net was "harmless" error which did not affect her ability to coach the cross country team. Dkt. 83 at 9.

Larson contends that Weekes took multiple adverse employment actions against her, including removing her name from athletic.net, spreading false information to other coaches, and subjecting her to years of unwanted physical conduct and text messages. Dkt. 110 at 13–14. She argues that Weekes did so in retaliation for her opposition to his sexual advances. *Id.* at 14–15.

An "adverse employment action" is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in a protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000)

(citing EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998)). Courts interpret adverse employment actions broadly. *Id.* It need not be a material change in the terms or conditions of employment. *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018). Instead, an alleged retaliatory action "is subject to challenge so long as the plaintiff can show that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Adverse employment actions may include "lateral transfers, unfavorable job references, and changes in work schedules." *Ray*, 217 F.3d at 1244. A hostile work environment also qualifies as adverse, which when based on retaliation for engaging in protected activity, is "obviously actionable" under the anti-retaliation provisions of Title VII. *Id.* at 1245; *see also Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 965 (9th Cir. 2004) (recognizing "retaliatory harassment" as a "valid basis for a retaliation claim").

Viewed in the light most favorable to Larson, the evidence would permit a jury to find that Weekes' removal of Larson's name from athletic.net is a materially adverse employment action. Although athletic.net is a third-party website, coaches input data into it. Gale testified that this input is mandatory. Dkt. 62-4 at 13. If a coach does not upload their athlete's intent to participate in an upcoming meet on athletic.net, then that athlete may not compete. *Id.* Gale testified that she did not remove Larson's name as assistant cross country coach and that the only other person with access was Weekes. *Id.* at 14. Weekes denies removing Larson's name. Dkt. 102-3 at 3. Where there is conflicting

testimony about an issue of material fact, that issue is inappropriate for resolution on summary judgment. *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotations marks omitted).

A reasonable jury could also find that Weekes' verbal and physical harassment constituted a hostile work environment, which the Ninth Circuit has made clear is actionable as an adverse employment action. *See Ray*, 217 F.3d at 1245. A reasonable jury could also find that Weekes retaliated against her by telling another teacher that she is "drinking" and "partying too much." *See* Dkt. 62-4 (Gale deposition testimony). The Court concludes that Larson presents sufficient evidence to satisfy the second element of her retaliation claim.

Lastly, the District contends that Larson provides no evidence that Weekes' "alleged later harassment [or any other adverse employment action] was in *retaliation* for resisting him." Dkt. 118 at 14.

Larson argues that Weekes testimony that he "perhaps knew" that Larson could be putting her job at risk if she complained about his text messages is enough to establish a causal link between Larson's request to stop the 2019 sexual assault and the sexually harassing conduct that subsequently continued. Dkt. 110 at 15. She also argues that Weekes only removed her name from athletic.net after she told him to stop contacting her and refused to see him when he harassed her by visiting her other place of employment. *Id.* at 16.

To prove retaliation, there must be a causal link between the protected activity and the adverse action. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir.

ORDER - 41

2002). The standards to prove causation under Title VII and WLAD are slightly different. Under Title VII, causation "must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360. (2013). That is, Larson must show that her protected activity was a "but for cause of the alleged adverse action by the employer." *Id.* at 262. A causal link can be inferred from circumstantial evidence, including the "employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l.*, 630 F.3d 928, 936 (9th Cir. 2011).

In contrast, to prove causation under WLAD, an employee must show that retaliation was a "substantial factor" in motivating the adverse employment action. *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 412 (2018). Retaliation need not be the main reason for the employment action. *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 746 (2014). At the summary judgment stage, the employee is required to show only that "a reasonable jury could find that retaliation was a substantial factor." *Cornwell*, 192 Wn.2d at 412–13.

Larson presents sufficient evidence to meet both the Title VII and WLAD causation standard. Viewed in the light most favorable to Larson, Weekes removed her name from the website shortly after he visited her other place of employment and after she told him never to contact him again. A reasonable jury could find that he modified the website in retaliation for her protected activity. *See Dawson*, 630 F.3d at 936 (A causal link can be inferred from the "proximity in time between the protected activity and the adverse action."). A reasonable jury could also find that Larson's objections to

Weekes' sexual advances caused the subsequent harassment. Weekes was obviously aware of her objections to his advances, yet he continued to send inappropriate text messages containing sexual innuendo.

Weekes' summary judgment motion on Larson's WLAD retaliation claim is **DENIED**.

The District's summary judgment motion Larson's Title VII and WLAD retaliation claims is **DENIED**.

**F.      Larson's negligent supervision and retention claims are dismissed as duplicative against QVSD but remain against Weakley.**

The District argues that Larson's state law claims for negligent supervision and retention must be dismissed as duplicative because they rely on the same facts as her employment discrimination claims. Dkt. 86 at 20 (citing *Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 853-54 (2000), *as amended on reconsideration* (Feb. 29, 2000)).

Larson argues the claims are not duplicative, because she relies on different facts in support of her negligent supervision and retention claims than those in support of her hostile work environment claims. Dkt. 112 at 24–25. She contends that the duty that gives rise to causes of action for negligence is analytically different than that required to prove the District is vicariously liable for her hostile work environment and retaliation claims. *Id.*

"Washington does not recognize claims for negligent supervision or retention by an employee against his or her employer when the negligence claim relies on the same

facts used to support an employee's discrimination claim." *Coleman-Askew v. King Cnty.*, No. C15-994-MJP, 2016 WL 4399602, at *7 (W.D. Wash. Aug. 18, 2016) (citing *Francom*, 98 Wn. App. at 866). Such claims can "only arise[ ] when the claim is based on a separate factual basis" from the discrimination claim. *Haubry v. Snow*, 106 Wn. App. 666, 678 (2001); *Francom*, 98 Wn. App. at 865.

To prevail on a Washington claim of negligent supervision, a plaintiff must show that (1) an employee of the defendant acted outside the scope of her employment, (2) the employee presented a risk of harm to others, (3) the employer knew or should have known in the exercise of reasonable care that the employee posed a risk to others, and (4) the employer's failure to supervise the employee was the proximate cause of the plaintiff's harm. *McDaniels v. Group Health Co-op.*, 57 F. Supp. 3d 1300, 1317 (W.D. Wash. 2014) (citing *Briggs v. Nova Servs.*, 135 Wn. App. 955, 966–67 (2006)). A negligent supervision claim is not a cognizable claim when an employee acts within the scope of their employment. *Richards v. Healthcare Res. Grp., Inc.*, 131 F. Supp. 3d 1063, 1076 (E.D. Wash. 2015).

To prove an employer's negligent retention of an unfit employee, a plaintiff must show that the employer had knowledge of the employee's unfitness or failed to exercise reasonable care to discover unfitness before retaining the employee. *Anderson v. Soap Lake School District*, 191 Wn.2d 343, 356 (2018).

To prove that the District is liable for negligent supervision and retention, Larson argues that the District knew about Weekes' inappropriate conduct with female athletes as early as April 2019, failed to conduct a thorough investigation, and failed to properly

supervise him considering its knowledge. Dkt. 112 at 25–27. She relies on these same facts to prove her WLAD hostile work environment claim. She asserts that the District is liable for Weekes' actions because it knew about sexual harassment reports against Weekes and "failed to perform an investigation or keep females safe." *Id.* at 18. Because Larson relies on the same facts to support both claims, Larson's negligence claims against QVSD are duplicative of her WLAD employment discrimination claims. The District's summary judgment motion on Larson's negligent supervision and retention claims against QVSD is **GRANTED.**

However, Larson also asserts negligent supervision and retention claims against defendant Weakley. She does not assert a WLAD discrimination claim against him. Larson's negligence claims against Weakley are not duplicative.

The District's summary judgment motion on those same claims against Weakley is **DENIED**.

**G.     The evidence of other acts is admissible to show the District's knowledge regarding reports of Weekes' inappropriate conduct with students.**

The District moves to strike or exclude all evidence concerning Weekes' alleged misconduct with students, asserting that it is both irrelevant and inadmissible as "other acts" evidence under Federal Rule of Evidence of 404(b)(1).[10] Dkt. 70 at 9–10. It also

---

[10] Larson moves to strike Weekes' declaration that he told her that he was planning to have back surgery in Fall 2023 because it is a self-serving statement submitted in bad faith. Dkt. 110 at 17. Weekes responds that his declaration was properly offered as personal knowledge evidence, and that none of his statements contradicted his prior deposition testimony or any factual statements proffered by Larson. Dkt. 117 at 6. The Court did not rely on Weekes'

ORDER - 45

requests the Court strike evidence concerning reports of boundary violations between other QVSD teachers and students, asserting that it is "entirely irrelevant to Larson's sexual harassment claim." *Id.* at 10. Lastly, it moves to strike the declarations of three students, who describe their interactions with Weekes as "strange" and "uncomfortable." *Id.* at 11. The District argues that none of these student declarations relate to Weekes' interactions with Larson or her hostile work environment claim, and that they also qualify as inadmissible character evidence under Rule 404. *Id.*

Larson contends that a motion to strike is inappropriate in this context. Dkt. 80 at 5–6 n.2. It contends that the student declarations confirm the reports to the District that Weekes sexually harassed female students. *Id.* at 5. Larson emphasizes that at least one of the student's complaints was verified by Reaume. *Id.*

Rule 404(b) generally excludes evidence of other acts or wrongs for the purpose of proving a person acted similarly on other occasions, but it allows for the admission of evidence of other acts to prove such things as motive, intent, knowledge, and absence of mistake. Larson does not offer evidence of Weekes' conduct with student athletes to prove that he committed harassment against Larson. The evidence is admissible for the purpose of showing notice; specifically, that the District received reports of Weekes' alleged sexual misconduct but failed to exercise reasonable care in investigating those allegations and in supervising him. The motion to strike evidence of Weekes' "other acts"

declaration in resolving these motions for summary judgment and therefore Larson's motion to strike is **DENIED** as moot.

is **DENIED**. The Court does not reach the remaining two motions to strike because the Court did not rely on the challenged evidence in resolving the motions for summary judgment. The remaining motions to strike are therefore **DENIED** as moot.

### III.   CONCLUSION

Larson's motion for partial summary judgment, Dkt. 61, is **GRANTED in part** solely on the issue of affirmative defense nine. Her remaining issues cannot be decided as a matter of law and are otherwise **DENIED**.

Weekes' motion for partial summary judgment, Dkt. 83, is **GRANTED in part** on the Title VII claims and **DENIED in part** on the WLAD retaliation claim. Larson's Title VII claims against Weekes are therefore **DISMISSED**.

The District's motion for summary judgment, Dkt. 86, is **DENIED in part** on the Title VII and WLAD hostile work environment and retaliation claims. It is **GRANTED in part** on the negligent supervision and retention claims against QVSD, but **DENIED in part** on those same claims against Weakley. Larson's negligence claims against QVSD are **DISMISSED**.

**IT IS SO ORDERED**.

Dated this 23rd day of January, 2026.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 47